Oliver M. BOND and Herta R.
Bond, Plaintiffs,

v.

OCTAGON PROCESS, INC., Defendant.

No. 87–41–ATH(DF).

United States District Court,
M.D. Georgia,
Athens Division.

Sept. 19, 1990.

E. Freeman Leverett, Heard, Leverett,
Adams and Phelps, P.C., Elberton, Ga., for
plaintiffs.

Peter J. Anderson, Peterson, Young, Self
& Asselin, Atlanta, Ga., Carl R. Woodward,
III, Bozonelis and Woodward, Chatham,
N.J., for defendant.

FITZPATRICK, District Judge.

This products liability case is before the
court for resolution of the defendant's mo-
tion to dismiss for lack of personal jurisdic-
tion and, alternatively, for summary judg-
ment based on the plaintiff's failure to
state a claim.

### I.  FACTS

On December 5, 1982, plaintiff Oliver
Bond was engaged in active service with
the National Guard at the Elberton, Geor-
gia, Armory and was washing an M578
recovery vehicle with a cleaning solvent,
MIL–C–11090D, NSN 6850–00–224–6665,
manufactured by the defendant.  The day
was a very cold one and the plaintiff ap-
plied the solvent using a brush and bucket
without protective gloves and without hav-
ing read the warning label on the solvent
cans.  After a short while, his hands start-
ed burning, but he continued to wash the
vehicles for several hours.  The pain in his
hands continued through the next day.

After the pain lasted for some time,
plaintiff went to see a civilian doctor who
diagnosed his problem as Buerger's dis-
ease, which is related to smoking.  Another
doctor, however, diagnosed the plaintiff's
condition as Raynaud's phenomenon, the
freezing of flesh in such a manner as to
damage permanently blood vessels and cut
off circulation.  In 1986, doctors at Eisen-

hower Medical Center at Fort Gordon, Georgia, identified the plaintiff's problem as acquired acrosteolysis caused by exposure to chemical solvents and a cold environment. Later, this diagnosis was changed to Raynaud's phenomenon caused by a cold environment and the defatting and evaporative effects of chemical solvents, rather than any toxic effects of the solvent in question itself. In other words, the plaintiff claims his injuries are due to the combination of cold weather and the effect of solvents in such weather of removing the oils on the skin and making it more vulnerable to the cold. Additionally, he claims that the solvent further cools the skin through evaporative cooling, which occurs when body heat is lost in warming the solvent on the skin and converting it from a liquid to a gaseous state. In cold weather, these properties of the solvent mean that any flesh coming into contact with it will cool more quickly than otherwise and be susceptible to freezing. Since the incident, plaintiff has suffered great pain and is in the process of losing his fingers and possibly his hands as the skin tissue slowly dies.

Plaintiff filed his complaint on May 7, 1987, seeking damages for personal injuries, including pain and suffering, permanent and total disability, loss of wages, loss of ability to labor, loss of fingers and for hospital and medical expenses. His wife, Herta Bond, also sued for loss of consortium, including services, society, companionship and affection. Plaintiffs allege that Mr. Bond's injuries were caused by the defendant's failure to provide adequate warnings of the dangers of exposure to solvents at low temperatures.

Octagon Process, the defendant, is a New Jersey corporation with no offices, employees, agents or other personal contacts with Georgia. Octagon has no agent for service of process in Georgia and has never sought approval from the state of Georgia to do business there.

At its plant in New Jersey, the defendant manufactures the solvent in question pursuant to a government contract. The solvent is made according to specifications issued by the government; Octagon did not develop or alter the formula supplied by the government. A government inspector stationed at the defendant's plant supervised the manufacturing process and had the authority to set aside any shipment that failed to conform to the specifications before it left the premises. The solvent was made for sale to the United States only and has never been sold to any private purchaser. At the time of the injury, Octagon was the only approved supplier of the solvent.

On June 14, 1989, Octagon filed its motion for dismissal and summary judgment based on three theories: (1) that there is no personal jurisdiction based on the Georgia long-arm statute; (2) that even if the statute gives this court jurisdiction the defendant will be put to unreasonable hardship if it must defend in Georgia; and (3) that the government contractor defense applies and shields the defendant from liability. After reviewing the applicable law and facts, the court is ready to issue its ruling.

## II. PERSONAL JURISDICTION

In a federal diversity suit, there is a two-step process used in determining whether a state jurisdictional statute confers jurisdiction over a non-resident defendant. First, it must be decided whether the defendant is amenable to suit under the state statute, as determined by the law of the state. Next, if the first step is met, the court must decide whether the assertion of jurisdiction over the defendant meets federal due process requirements. *Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843 (11th Cir.1988); *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 195–96 (5th Cir.1980).

The plaintiff seeks to bring the defendant within the reach of the Georgia long-arm statute, O.C.G.A. § 9–10–91, which reads in pertinent part:

A court of this state may exercise personal jurisdiction over any non-resident or his executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use or possession enumerated in this Code section,

in the same manner as if he were a resident of the state, if in person or through an agent, he: ...

(3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

. . . . .

■ Plaintiffs must show that the defendant is amenable to suit under this statute before any federal constitutional questions are reached. It has been determined by Georgia courts that the Georgia long-arm statute allows for jurisdiction to be exercised over defendants to the maximum extent allowed by due process. *Value Engineering Co. v. Gisell,* 140 Ga.App. 44, 230 S.E.2d 29 (1976); *Hollingsworth v. Cunard Line,* 152 Ga.App. 509, 263 S.E.2d 190 (1979). In order to comply with this section of the long-arm statute, the following test must be satisfied:

(1) The nonresident has purposefully done some act or consummated some transaction with or in the forum (but the actual act or omission resulting in the injury here need not have occurred in this state.) The defendant need not be physically within the forum when this act or transaction occurs and a single such instance may suffice;

(2) The Georgia plaintiff must have a legal cause of action in tort against the nonresident, which arises out of, or results from, the purposeful activity of the defendant involving this state; a resident is the victim of a "tortious act" when he suffers an injury here due to an act or omission of negligence occurring outside this state; and

(3) If the requirements of (1) and (2) are satisfied, the exercise of jurisdiction over the nonresident must be "reasonable." *Shellenberger v. Tanner,* 138 Ga.App. 399, 404–05, 227 S.E.2d 266, 273 (1976); cited with approval in *Smith v. Smith,* 254 Ga. 450, 330 S.E.2d 706, 706 (1985); *Delong,* 840 F.2d at 849.

The court is not satisfied that the first part of the *Shellenberger* test has been met in this case. It is undisputed that Octagon has no direct ties with Georgia, as noted above. The deposition of Mr. Lee Leibmann, Octagon's president, indicates that the defendant shipped the solvent in question to various government depots around the country, after which the government sent it to where it was needed. (Depo. pp. 22–24). Thus, the defendant shipped the product to an independent distributor who then controlled where it was ultimately sent. This is the closest contact Octagon has ever had with Georgia, and it simply does not qualify as "a transaction with or in the forum." *Shellenberger,* 227 S.E.2d at 273. If, for example, Octagon had directly sent the solvent to the National Guard armory in Elberton or consummated a bargain to sell the solvent directly to the Georgia National Guard this would of course satisfy the test, but such is not the case here, and the defendant is thus not amenable to suit under the Georgia long-arm statute.

■ Even if all three of the *Shellenberger* requirements had been fulfilled, Octagon would still not be subject to the jurisdiction of this court because federal constitutional due process requirements are not satisfied. The Supreme Court has laid down and developed guiding principles of due process in a series of cases over the past several decades.[1] In *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Court

---

1. There are two types of personal jurisdiction: general and specific. General personal jurisdiction arises from a party's contacts with the forum state that are unrelated to the litigation; the test is whether the party had "continuous and systematic" general business contacts with the forum state. Specific personal jurisdiction is based on a party's contacts with the forum state that are related to the litigation. *Delong,* 840 F.2d at 853 (citations omitted). The plaintiff in the case at bar has not alleged that general jurisdiction exists over the defendant and could not do so given the facts. The discussion in the text therefore concerns specific jurisdiction.

stated the basic two-part test for determining when states may exercise jurisdiction over non-resident defendants: (1) they must have "minimum contacts" with the forum state and (2) the maintenance of the suit must not offend "traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. at 158. (The second part of this test has been rephrased to mean that it must be "reasonable" for a court to exercise jurisdiction over a defendant. *Delong*, 840 F.2d at 854.) This standard was later clarified to mean that due process requires some purposeful availment by the defendant of the privilege of conducting activities in the forum state and thus invoking the benefits and protections of that state's laws. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958).

A limit on expanding notions of due process was provided in *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), in which the Court rejected the notion that the defendant was amenable to suit simply because of the "foreseeability" that the item it sold might enter the forum state. Instead, the Court decided that due process was based on whether the defendant's conduct and connection with the forum state were such that it could reasonably anticipate being haled into court there. 444 U.S. at 297, 100 S.Ct. at 567. In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Court stated that jurisdiction over a non-resident defendant was proper if the defendant had delivered its products into the stream of commerce with the expectation that they would be purchased by consumers in the forum state and those products subsequently injured forum consumers. 471 U.S. at 473, 105 S.Ct. at 2182.

The Supreme Court greatly narrowed the application of the stream of commerce theory in *Asahi Metal Ind. v. Superior Court of California, Solano County*, 480 U.S. 102, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987). Asahi was a Japanese valve assembly manufacturer who sold its products to a Taiwanese tire manufacturer who exported the completed tires to the United States. After a products liability suit was filed because of an accident allegedly caused by a defective tire, the Taiwanese defendant filed a cross-claim for indemnification which became the subject of the case that reached the Supreme Court after the underlying action had been settled and dismissed. The California Supreme Court had earlier determined that due process would allow for the exercise of jurisdiction over Asahi in California, since the defendant had intentionally placed its products in the stream of commerce and knew that some of the completed tires containing its products would be sold in California.

In analyzing whether Asahi had form sufficient minimum contacts with California to justify that state's exercise of jurisdiction, a plurality of the Court noted that since its decision in *World–Wide Volkswagen*, 444 U.S. 286, 100 S.Ct. 559, two versions of the stream of commerce theory had arisen. Some courts had read the due process clause as allowing for jurisdiction based on nothing more than the defendant's placing the product in the stream of commerce, while others had required some action of the defendant more purposefully directed at the forum state than mere awareness that its product would eventually reach there. The California Supreme Court had adhered to the former view of due process. *Asahi*, 107 S.Ct. at 1032.

The Supreme Court, however, decided that this was not sufficient and that for the due process clause to be satisfied there had to be some act of the defendant purposefully directed toward the forum state. Merely placing an item in the stream of commerce, without more, was held not to be enough. Furthermore, the Court stated that even the defendant's awareness that its product would eventually reach the forum state via the stream of commerce did not convert the act of placing the product into the stream into an act purposefully directed toward the forum state. 107 S.Ct. at 1033.

Keeping these standards in mind, it is clear to this court that it cannot exercise personal jurisdiction over Octagon. Even assuming that the plaintiffs are correct when they claim that Octagon knew its

product would eventually enter Georgia (Brief on Behalf of Plaintiffs in Opposition to Defendant's Motions to Dismiss, for Failure to State a Claim, and for Summary Judgment, pp. 8–9), *Asahi* has made it clear that this is simply not enough to form sufficient minimum contacts so that Octagon could foresee being haled into court here. The record reveals no other act by the defendant purposefully directed toward Georgia as required by *Asahi*. When Octagon sold the solvent to the Department of Defense, which acted as an independent distributor, it merely placed its product into the stream of commerce, an act which alone will not allow this court to exercise personal jurisdiction in Georgia.[2]

Plaintiffs make a valiant, but unsuccessful, effort to distinguish *Asahi*. They correctly point out that *Asahi* dealt with a cross-claim for indemnification after the original suit involving the injured party had been settled. While valid, this distinction is insufficient to overcome the general jurisdictional rules laid down in the case. To adopt plaintiff's interpretation would limit *Asahi* to cases with facts practically identical to it, something which this court declines to do. Also, plaintiffs claim that one of the main reasons the Supreme Court found that there was no jurisdiction over Asahi in California was because the case involved two foreign parties and to have exercised jurisdiction over the defendant would have subjected it to the unique burdens of defending in a foreign legal system. This is also true, but this reason concerns the *second* part of the *International Shoe* test (whether exercising jurisdiction over the defendant is reasonable), and has nothing to do with the first part (whether the defendant has sufficient minimum contacts with the forum). While it may be reasonable to exercise jurisdiction over Octagon in this case, the court still cannot do so if the defendant lacks sufficient minimum contacts with the forum, which, as discussed above, is true of Octagon.

In addition, the plaintiffs attempt to distinguish *World–Wide Volkswagen*, which itself placed some limits on due process jurisdiction, by noting that the defendant in that case, over whom the Supreme Court decided that jurisdiction could not be exercised, was merely a distributor of the product and not a manufacturer. Plaintiffs give great weight to the fact that Justice Blackmun himself pointed out this distinction, 444 U.S. at 317–318, 100 S.Ct. at 570 (Blackmun, J., dissenting), and claim that since this suit is against a manufacturer the court should exercise its jurisdiction. The court notes, however, that the defendant in *Asahi*, over whom the Supreme Court held there was no jurisdiction in part because of insufficient minimum contacts, was also a manufacturer, and thus the plaintiffs' distinction has little influence. As *Asahi* makes clear, the essential question is whether the defendant, regardless of his status as a manufacturer or distributor, has done some act purposefully directed toward the forum state so as to form sufficient minimum contacts with that state such that he could anticipate being haled into court there. Regarding Octagon, this requirement simply has not been fulfilled.

Plaintiffs also place great reliance on *Oswalt*, 616 F.2d 191, and some similar cases.[3] In *Oswalt*, the plaintiff was injured when a cigarette lighter malfunctioned. The lighter had been manufactured in Japan but distributed in the United States by Scripto, Inc., an American Corporation. There was no evidence that the Japanese manufacturer had any officers or agents in the United States or any contacts with the United States at all except for the distributing agreement with Scripto.

---

**2.** The court is aware that this reading of *Asahi* will allow defendants to organize their operations to avoid selected jurisdictions and their laws. Cound, Friedenthal, Miller & Sexton, *Civil Procedure* 137 (5th ed. 1989). Nonetheless, the Supreme Court's ruling compels this result.

**3.** The plaintiffs also cite *Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081 (5th Cir.1984), and *Petroleum Helicopters, Inc. v. Avco Corp.*, 804 F.2d 1367 (5th Cir.1986). In both cases the Fifth Circuit held that the defendants were subject to personal jurisdiction because they had placed their products in the stream of commerce with the expectation or knowledge that the goods would reach the forum state.

Nonetheless, the court found that there was personal jurisdiction over the manufacturer because it knew that its lighters were being sold nationally in the United States and thus had reason to know that its products would reach the scene of the injury. By utilizing the distribution network established by Scripto, the Japanese company had established sufficient minimum contacts so that it could reasonably expect to be haled into court in this country. 616 F.2d at 198–200.

Plaintiffs' reliance on *Oswalt* and cases with similar holdings is misplaced, however, because of changes in the law. *Oswalt* was decided in 1980 immediately after the Supreme Court's decision in *World–Wide Volkswagen* and adhered to the view that merely placing a product in the stream of commerce without more was enough to satisfy due process requirements. As noted above, the Supreme Court rejected this line of thinking in *Asahi* by holding that due process also requires some purposeful act by the defendant directed toward the forum state. *Oswalt* and cases like it simply do not speak to the case at bar.

### III. CONCLUSION

After careful consideration of the facts and law in this case, the court has decided that Octagon's motion to dismiss for lack of personal jurisdiction due to insufficient minimum contacts between it and the forum state should be GRANTED. Accordingly, the court need not reach the questions of whether it would be reasonable to exercise jurisdiction over the defendant in Georgia or the government contractor defense. The plaintiffs' case is hereby ordered DISMISSED.

SO ORDERED.