954 F.2d 1553
 60 USLW 2568
 Sherman J. OLIVIER, Plaintiff-Appellant,
v.
MERRITT DREDGING COMPANY, INC.,
et al., Defendants,
South Carolina Property and Casualty Insurance Guaranty
Association, Louisiana Insurance Guaranty
Association, Defendants-Appellees.
 No. 91-7078.
 United States Court of Appeals, Eleventh Circuit.
 March 6, 1992.
 
 Johnson, Senior Circuit Judge, filed dissenting opinion.
 G. Hamp Uzzellee, III, Brian P. McCarthy, Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for Sherman J. Olivier.
 Patrick H. Sims, Cabniss & Johnston, Mobile, Ala., for La. Ins.
 Gregory C. Buffalow, Robert S. Frost, Johnston, Adams, Bailey, Gordon & Harris, Mobile, Ala., for South Carolina Ins.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before JOHNSON*, CLARK*, and PECK**, Senior Circuit Judges.
 JOHN W. PECK, Senior Circuit Judge:
 
 
 1
 Sherman J. Olivier, a resident of Louisiana and a seaman injured aboard a vessel in Alabama, appeals the dismissal of writs of garnishment issued to the Louisiana Insurance Guaranty Association [LIGA] and the South Carolina Property and Casualty Insurance Guaranty Association [SCIGA]. The district court in Alabama dismissed the writs on the ground that the court lacked personal jurisdiction over the garnishees. The court held that LIGA and SCIGA did not have sufficient minimum contacts with Alabama in order to be subject to personal jurisdiction within the state. Because we find that SCIGA and LIGA had sufficient minimum contacts with Alabama and we believe that judicial economy would best be served by keeping this litigation within that forum, we reverse the district court's order.
 
 I. FACTS
 
 2
 On August 1, 1983 Sherman J. Olivier sustained personal injuries while employed by the Merritt Dredging Company [Merritt] as a sailor aboard a vessel in Alabama on the Alabama River. At the time of his injuries, Olivier was a resident of Louisiana. Merritt was a South Carolina corporation with its principal place of business in South Carolina.
 
 
 3
 On March 30, 1984 Merritt filed for bankruptcy in South Carolina. In order to protect the bankruptcy estate, the bankruptcy court temporarily stayed the personal injury suit Olivier had brought against Merritt in Alabama. The bankruptcy court lifted its stay on September 26, 1985.
 
 
 4
 To provide insurance for its various operations including its activity in Alabama, Merritt contracted with the Midland Insurance Company [Midland]. Like Merritt, Midland faced financial difficulties. On April 3, 1986 Midland, a New York corporation, was liquidated pursuant to an order of the Supreme Court of New York. The liquidation proceedings once again stayed Olivier's personal injury suit against Merritt.
 
 
 5
 The second stay was lifted on May 22, 1987. In December 1988 a jury in Alabama awarded Olivier $507,340.00. On February 14, 1989 Olivier received a judgment against Merritt of $522,190.00, interest from the date of the judgment, and costs.
 
 
 6
 Due to the insolvency of both Merritt and its insurer, Midland, Olivier requested that the district court in Alabama issue writs of garnishment to LIGA, SCIGA, and the Alabama Insurance Guaranty Association [AIGA]. On July 21, 1989 the district court issued the writs.
 
 
 7
 AIGA, LIGA, and SCIGA are unincorporated associations created by state statutes. See Ala.Code §§ 27-42-1 et seq. (1975), La.Rev.Stat.Ann. §§ 22:1375 et seq. (West Supp.1991), S.C.Code Ann. §§ 38-31-10 et seq. (Law.Co-op. 1976).[1] The AIGA writ is not at issue in this appeal. The guaranty associations were established for the purpose of avoiding financial loss or excessive delay in payment to claimants or policyholders due to the insolvency of an insurer. See La.Rev.Stat.Ann. §§ 22:1376, 22:1382, S.C.Code Ann. § 38-31-60; see also Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674, 676 (2d Cir.1990). Insurance companies that underwrite risks in the state in which the guaranty association exists are required to pay assessments necessary to fund the guaranty association. See La.Rev.Stat.Ann. §§ 22:1380, 22:1382, S.C.Code Ann. §§ 38-31-40, 38-31-60. Prior to its liquidation, Midland was subject to assessments by LIGA and SCIGA. Pursuant to LIGA's and SCIGA's motions, on December 21, 1990 the district court in Alabama dismissed the writs of garnishment it had previously issued on the ground that the court lacked personal jurisdiction over the garnishees. Olivier appeals the district court's order of December 21, 1990.
 
 II. DISCUSSION
 A. ALABAMA LONG ARM JURISDICTION
 
 8
 This circuit conducts de novo review of a district court's dismissal of an action for lack of personal jurisdiction. Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir.1990). We begin our inquiry into whether the district court properly refused to assert personal jurisdiction with a two-part analysis. First, we consider whether the district court could obtain personal jurisdiction over the defendants pursuant to the applicable state long-arm statute. Second, we consider whether the exercise of personal jurisdiction would violate the due process clause of the Fourteenth Amendment to the United States Constitution.
 
 
 9
 In interpreting the reach of the state's long-arm statute, the Supreme Court of Alabama has extended the jurisdiction of Alabama courts to the extent permissible under the due process clause of the Fourteenth Amendment. See Alabama Waterproofing Co., Inc. v. Hanby, 431 So.2d 141, 145 (Ala.1983). Thus, in order to determine whether the district court in Alabama properly refused to exercise personal jurisdiction, we need only consider whether the exercise of jurisdiction would have satisfied the requirements of due process.
 
 B. DUE PROCESS
 
 10
 The determination of whether a district court can exercise personal jurisdiction over a non-resident defendant is itself a two-part inquiry. In the first prong of our due process inquiry, we consider whether the defendants, LIGA and SCIGA, engaged in minimum contacts with the State of Alabama. In the second prong of our inquiry, we consider whether the exercise of personal jurisdiction over the defendants would offend "traditional notions of fair play and substantial justice." Madara, 916 F.2d at 1516 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).
 
 1. Minimum Contacts
 
 11
 In analyzing the parties' arguments we are guided by the language of several Supreme Court opinions. As the Supreme Court has stated:
 
 
 12
 [M]inimum-contacts analysis presupposes that two or more States may be interested in the outcome of a dispute, and the process of resolving potentially conflicting "fundamental substantive social policies" can usually be accommodated through choice-of-law rules rather than through outright preclusion of jurisdiction in one forum. (citations omitted) Burger King Corp. v. Rudzewicz, 471 U.S. 462, 483 n. 26, 105 S.Ct. 2174, 2188 n. 26, 85 L.Ed.2d 528 (1985).
 
 
 13
 In 1989 Olivier, a resident of Louisiana, received a judgment in Alabama (the place where he sustained his injuries) against Merritt, a South Carolina corporation. Olivier contends that the judgment entitled him to proceed against Merritt's bankrupt insurer, Midland. Olivier maintains that his claim is a "covered claim" within the meaning of the Louisiana and South Carolina statutes governing the respective state insurance guaranty associations; Midland is an insolvent insurer and the claimant or insured was a resident of either Louisiana or South Carolina at the time of the insured event. See La.Rev.Stat.Ann. § 22:1379(3)(a)[2], S.C.Code Ann. § 38-31-20(6)[3].
 
 
 14
 Furthermore, Olivier argues that since his claim is a "covered claim", according to the respective statutes LIGA and SCIGA are deemed insurers to the extent of Midland's obligations. See La.Rev.Stat.Ann. §§ 22:1382 A(1) and (2)[4], S.C.Code Ann. § § 38 31 60(a) and (b)[5].
 
 
 15
 Olivier contends that Midland is subject to personal jurisdiction in Alabama because it provided insurance coverage for Merritt for accidents that occurred while operating its vessel in Alabama waters. By guaranteeing payment of Midland's policies that provided insurance for claimants who are state residents or insureds who are state residents, Olivier contends LIGA and SCIGA should reasonbly have foreseen that they would be subject to suit in other jurisdictions. Olivier claims that the statutes, which place LIGA and SCIGA in the position of an insolvent insurer, impose affirmative, extraterritorial obligations upon them. Because Midland is subject to personal jurisdiction in Alabama, Olivier argues that both LIGA and SCIGA are subject to personal jurisdiction in Alabama as well. Olivier argues that LIGA's and SCIGA's statutory obligations establish minimum contacts with Alabama sufficient to justify the district court's exercise of personal jurisdiction over them.
 
 
 16
 As mere creations of their respective state statutes, LIGA and SCIGA claim they have not purposefully directed any activity toward the State of Alabama. Neither LIGA nor SCIGA maintains any offices or agents in Alabama. The associations contend that Midland's contacts with Alabama are not at issue since personal jurisdiction is not being sought after Midland, but after LIGA and SCIGA. LIGA and SCIGA claim that they will be denied due process if they are subject to legal liability in Alabama on account of the unilateral activity of a third party--Midland.
 
 
 17
 In addition, LIGA and SCIGA argue that although it might have been foreseeable that the associations could become involved in litigation in Alabama, such foreseeability alone is insufficient to confer personal jurisdiction. LIGA and SCIGA maintain that foreseeability is only one factor to be considered in an analysis of a defendant's minimum contacts with a forum.
 
 
 18
 LIGA and SCIGA note that neither of the state insurance guaranty acts specifically authorizes suit against an insurance guaranty association outside the state which created the association. The associations argue that this conspicuous absence indicates that it was not the intent of the state legislatures to permit LIGA and SCIGA to be subject to suit in other jurisdictions.
 
 
 19
 In support of their arguments, LIGA and SCIGA rely upon the reasoning of the district court in Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 715 F.Supp. 94, 97 (S.D.N.Y.1989), aff'd on other grounds, 896 F.2d 674 (2d Cir.1990). We are not persuaded by the court's reasoning in Rhulen. Indeed, we believe the district court decision concerning personal jurisdiction over AIGA and other state insurance guaranty associations is entitled to no weight since the Second Circuit held that the district court lacked subject matter jurisdiction; this holding precluded any consideration of the existence of personal jurisdiction over the defendants. Rhulen, 896 F.2d at 675-676.
 
 
 20
 For the reasons outlined below we believe Olivier has the superior argument. In the seminal case, International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, the Supreme Court of the United States held that the due process clause of the Fourteenth Amendment requires that a defendant be subject to the personal jurisdiction of the court. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). Thus, we recognize that even if the forum state is the most convenient location for litigation, the due process clause may act to divest a state's courts of the power to render a valid judgment if a defendant does not have the requisite minimum contacts with the forum. World-Wide Volkswagen, 444 U.S. at 294, 100 S.Ct. at 566; Hanson v. Denckla, 357 U.S. 235, 251, 254, 78 S.Ct. 1228, 1238, 1240, 2 L.Ed.2d 1283 (1958).
 
 
 21
 The Supreme Court has opined that the due process clause of the Fourteenth Amendment requires that defendants have "fair warning" that particular activities may subject them to the jurisdiction of foreign sovereigns. Burger King, 471 U.S. at 472, 105 S.Ct. at 2182. One of the considerations important in assessing whether or not a defendant has fair warning is the foreseeability of suit within the jurisdiction. The foreseeability that is critical in an analysis of minimum contacts is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. at 567. In attempting to define when a defendant should reasonably anticipate being haled into court, the Supreme Court has stated "... there must be some act by which the defendant purposefully availed itself of conducting activities within the forum state." Hanson, 357 U.S. at 253, 78 S.Ct. at 1239-1240. This requirement exists to ensure that a defendant will not be subject to legal liability in a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. Burger King, 471 U.S. at 475, 105 S.Ct. at 2183.
 
 
 22
 In the instant case, LIGA and SCIGA are subject to legal liability in Alabama neither on account of random contacts nor on account of the unilateral activity of Midland Insurance. We hold that the acts of guaranteeing insurance obligations within the state and of assuming the role of insurer are of such a nature that they justify the legal fiction that LIGA and SCIGA have consented to service of process and suit in Alabama. Cf. International Shoe, 326 U.S. at 318, 66 S.Ct. at 159.
 
 
 23
 LIGA and SCIGA guaranteed payment of "covered claims". See La.Rev.Stat.Ann. § 22:1379(3)(a), S.C.Code Ann. § 38-31-20(6). The "claimant", Olivier, was a Louisiana resident. The "insured", Merritt, was a South Carolina corporation. The insurance company, Midland, was an "insolvent insurer" authorized to transact business in Louisiana and South Carolina at the time of Olivier's accident. In Alabama, the state in which he suffered injuries, Olivier received a judgment against Merritt. Because neither Merritt nor its insurer, Midland, could meet its obligations to the appellant, Olivier proceeded against the associations that guaranteed payment.
 
 
 24
 Not only did LIGA and SCIGA guarantee payment of "covered claims", but they also assumed all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent. See La.Rev.Stat.Ann. § 22:1382 A(2), S.C.Code Ann. § 38-31-60(b). By the language of the statutes that govern LIGA and SCIGA, we conclude that these associations had fair warning that they could be subject to suit for "covered claims" in jurisdictions outside of their respective states.
 
 
 25
 LIGA and SCIGA assessed Midland in order to have sufficient funds to guarantee "covered claims". Midland insured Merritt's operations in Alabama. By serving as guarantors of Midland's obligation to Olivier, LIGA and SCIGA purposefully availed themselves of conducting activities within Alabama. Indeed, since the Supreme Court's decision in McGee v. International Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957), it has been the law that when a party assumes insurance obligations in a state in which it has no other business, the party has submitted to the jurisdiction of the state's courts.
 
 
 26
 In reaching our conclusion we draw upon the holding of the Supreme Court of Alabama in Keelean v. Central Bank of the South, 544 So.2d 153 (Ala.1989). In Keelean, non-resident defendants guaranteed payment of a promissory note of a foreign corporation issued to an Alabama bank. Even though the defendants signed the guaranties outside of Alabama, the court held that the guarantors should have foreseen in the event of a default the effects of their guaranties in the State of Alabama. The court concluded that execution of the guaranties constituted sufficient minimum contacts required by the due process clause. Keelean, 544 So.2d at 157-158.
 
 
 27
 Moreover, other courts of appeals have reached conclusions similar to the one we reach today. In Forsythe v. Overmyer, 576 F.2d 779 (9th Cir.1978), cert. denied, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978), the Ninth Circuit held that a non-resident third party's personal guaranty of a lease contract to be executed in California constituted minimum contact sufficient to subject the third party to the jurisdiction of California courts. Forsythe, 576 F.2d at 783-784. See also National Can Corp. v. K Beverage Co., 674 F.2d 1134, 1137 (6th Cir.1982); Marathon Metallic Bldg. Co. v. Mountain Empire Constr. Co., 653 F.2d 921, 923 (5th Cir. Unit A Aug. 1981).
 
 
 28
 We conclude that the associations' obligations to defend suits in other jurisdictions would not be unduly burdensome. Indeed, both LIGA and SCIGA may alleviate the cost of litigation in other jurisdictions by adjusting their insurance assessments. Or if the expenses are too great, they have the option of altering their obligations and coverage for claims. Cf. World-Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. at 567.
 
 2. Fair Play and Substantial Justice
 
 29
 Once a court has decided that a defendant has established minimum contacts within a forum state, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." Burger King, 471 U.S. at 476, 105 S.Ct. at 2184. As the Supreme Court has stated, other factors may serve to establish the reasonableness of personal jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. Burger King, 471 U.S. at 477, 105 S.Ct. at 2184. Some of these factors include: the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. Id.
 
 
 30
 In addition, as the Supreme Court of the United States has noted "... modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." McGee, 355 U.S. at 222-223, 78 S.Ct. at 201. The Supreme Court subsequently stated that the historical developments noted in McGee have only accelerated in the generation since that case was decided. World-Wide Volkswagen, 444 U.S. at 293, 100 S.Ct. at 565. By guaranteeing payment of an insurance claim that arose out of an accident in Alabama and that went to judgment within the State, LIGA and SCIGA engaged in economic activity in Alabama. Due to the effects of their economic activity within the State, requiring LIGA and SCIGA to adjudicate in Alabama is not a substantial burden.
 
 
 31
 It would be unduly burdensome, however, to require Olivier to seek coverage for his claim from LIGA in Louisiana courts and from SCIGA in South Carolina courts. Such a requirement would spread thin his resources and would hamper Olivier's ability to obtain quick, convenient, and effective relief. See McGee, 355 U.S. at 223, 78 S.Ct. at 201. Indeed, it would frustrate the very purposes of the state insurance guaranty associations. See e.g. La.Rev.Stat.Ann. § 22:1376. Furthermore, a requirement that Olivier sue in both Louisiana and South Carolina would pose an unnecessary waste of precious judicial resources. Separate litigations do not necessarily insure fairness; in this case they would inhibit it.
 
 III. CONCLUSION
 
 32
 For the reasons stated above we REVERSE the order of the district court and REMAND the case for further proceedings consistent with this opinion.
 
 JOHNSON, Senior Circuit Judge, dissenting:
 
 33
 Prior to today, the particular issue in this case, whether personal jurisdiction over an out-of-state insurance guaranty association is consistent with due process, had not yet been resolved by any United States Court of Appeals. As of today, the issue continues to await a correct resolution. In my opinion, the majority overrates the less-than-minimum contacts of LIGA and SCIGA to Alabama and further exacerbates this error by misconstruing the traditional notions of fair play and substantial justice. Olivier clearly fell short of his burden of justifying the exercise of personal jurisdiction over these non-profit creatures of foreign state legislation. See Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 490 (5th Cir.1974) (the burden of proving personal jurisdiction is on the plaintiff).
 
 1. Minimum Contacts
 
 34
 The majority finds sufficient minimum contacts in two acts taken by LIGA and SCIGA: (1) "guaranteeing insurance obligations within the state" of Alabama (emphasis added) and (2) "assuming the role of insurer." There are three flaws in the majority's finding. My first two objections relate to the majority's characterizations of the enabling statutes. My final criticism of the majority's finding of minimum contacts relates to its analytical focus.
 
 
 35
 First, the majority's assertion that LIGA and SCIGA guarantee "insurance obligations within" Alabama constitutes an imprecise interpretation of the statutes at issue because it implies that the statutes focus, at least to some degree, on Alabama. In order for a claim to be "covered" under the statutes, either (1) the claimant or the insured must reside in the state which established the insurance guaranty association, or (2) the property giving rise to the claim must be permanently located in the state which established the insurance guaranty association. La.Rev.Stat.Ann. § 22:1379(3)(a) (West Supp.1991); S.C.Code Ann. § 38-31-20(6) (Law.Co-op.1990). Consequently, although it is technically true that LIGA and SCIGA guarantee insurance obligations within Alabama, they do so only because a covered claim could arise in any state, as long as one connection exists between the state which created the insurance guaranty association and either the plaintiff, the insured, or the property giving rise to the claim.[1]
 
 
 36
 Second, the majority's reliance on the provisions which mandate LIGA and SCIGA's assumption of the role of the insurer exalts form over substance. See La.Rev.Stat.Ann. § 22:1382(A)(2) (West Supp.1991) ("The association shall [b]e deemed the insurer to the extent of its obligation on the covered claim...."); S.C.Code Ann. § 38-31-60(b) (Law.Co-op.1990) ("The Association ... is considered the insurer to the extent of its obligation on the covered claims...."). These statutory provisions relate only to substantive insurance obligations; to interpret them as mandating that LIGA and SCIGA shall always be deemed or considered to be the insurer for purposes of personal jurisdiction attributes an unreasonably broad scope to these provisions.
 
 
 37
 Finally, the majority's minimum contacts analysis reflects an undue focus on foreseeability. See ante at 1557. Foreseeability ought not to be the sole focus of the due process analysis. Rather, this Court must also find that LIGA and SCIGA " 'purposefully directed' " their activities at Alabama. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528 (1985). I.e., LIGA and SCIGA must have " 'purposely derive[d] benefit' " from their Alabama contacts, id. at 473, 105 S.Ct. at 2183, or "manifestly ... availed [themselves] of the privilege of conducting business [in Alabama] shielded by 'the benefits and protections' of [Alabama] laws," id. at 476, 105 S.Ct. at 2184. The contacts relied on by the majority clearly fail to establish such purposeful availment by LIGA and SCIGA. Rather, those contacts are " 'random, fortuitous,' [and] 'attenuated,' " id. at 475, 105 S.Ct. at 2183. (citations omitted), and, as such, they are insufficient to justify an exercise of personal jurisdiction.[2] Furthermore, fairly read, these provisions indicate an intent to bestow benefit upon only in-state claimants and insureds, thus negating any inference that LIGA and SCIGA purposefully subjected themselves to the benefits of Alabama law.
 
 
 38
 The remainder of the majority's evaluation of minimum contacts further obfuscates the purposeful availment requirement. The majority asserts that, because both LIGA and SCIGA assessed dues against Midland and Midland insured a risk in Alabama, purposeful availment exists under the reasoning of McGee v. International Life Insur. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), involving a defendant who was a primary insurer, and four other cases involving defendants who were private guarantors. All of those cases, however, are clearly distinguishable from the one at bar. First, in all five cases, the defendant was aware that an occurrence of the insured risk or a default on the guaranteed note would have effects in the forum state. See McGee, 355 U.S. at 223, 78 S.Ct. at 201; National Can Corp. v. K Beverage Co., 674 F.2d 1134, 1137 (6th Cir.1982); Marathon Metallic Bldg. Co. v. Mountain Empire Constr. Co., 653 F.2d 921, 923 (5th Cir. Unit A Aug. 1981); Forsythe v. Overmyer, 576 F.2d 779, 781-83 (9th Cir.), cert. denied, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978); Keelean v. Central Bank of the South, 544 So.2d 153, 157 (Ala.1989). In the case sub judice, it was merely foreseeable rather than actually foreseen that, if Midland generated a covered claim, it could arise in Alabama. Moreover, in all but one of the majority's cases, the court attributed a profit-motive to the establishment of contacts with the forum state by the defendant, a private person or entity. See McGee, 355 U.S. at 221-23, 78 S.Ct. at 200-01; National Can, 674 F.2d at 1137; Marathon Metallic, 653 F.2d at 923; Forsythe, 576 F.2d at 781-83.[3] Unlike the cases relied on by the majority, the case at bar involves non-profit creatures of statute,[4] formed solely to aid beneficiaries of policies issued by insolvent insurers,[5] in which membership is compulsory for insurers who wish to do business in the state that created the insurance guaranty association,[6] whose funds are derived solely from premiums written in the state which created the association,[7] and whose assessments against member insurers do not reflect an evaluation of risk, but rather are simply proportional to the particular member's share of the total amount of premiums written in the state that created the association.[8] Because the insured in this case, Merritt, was a South Carolina corporation, a portion of the premiums it paid to Midland went toward funding SCIGA--i.e., SCIGA received funding directly related to the insurance policy that covered the Alabama tort which gave rise to the instant action. LIGA, however, received no additional funds as a result of the policy at issue in this case although it did benefit to the extent that Midland paid LIGA a portion of its premiums from Louisiana insureds, but those Louisiana insureds have absolutely no connection to this litigation. Neither SCIGA nor LIGA can be said to have purposefully availed themselves of the benefits of Alabama law merely by receiving money from Midland, who coincidentally insured the Alabama tort; this money in no way reflected an evaluation of the Alabama risks under the Merritt policy or an effort to profit from Midland's insurance of risks in Alabama.
 
 
 39
 Moreover, the priority provisions of the guaranty statutes (which the majority ignores) also negate a finding of purposeful availment. These provisions specify, in cases where more than one guaranty association may be liable, from which association the claimant must seek recovery first. La.Rev.Stat.Ann. § 22:1386(B) (West Supp.1991); S.C.Code Ann. § 38-31-100(2) (Law.Coop.1990).[9] Olivier argued that these provisions clearly imply that LIGA and SCIGA anticipated being haled into foreign fora. The more likely explanation, however, posits that LIGA and SCIGA expected that the claimant would exhaust his remedy against the association that is required to be sued first in its state's forum, then pursue a remedy against the next association in its state's forum and so on. Rather than purposeful availment, the priority provisions indicate a desire on the part of LIGA and SCIGA to be sued only in their own fora.
 
 
 40
 I therefore believe that LIGA and SCIGA lack minimum contacts with Alabama.
 
 2. Fair Play and Substantial Justice
 
 41
 Olivier would still be entitled to a reversal, notwithstanding his insufficient showing on the minimum contacts prong, if he had made an exceptionally strong showing that an exercise of personal jurisdiction over LIGA and SCIGA would be consistent with fair play and substantial justice. Sun Bank, N.A. v. E.F. Hutton & Co., 926 F.2d 1030, 1034-35 (11th Cir.1991). This he failed to do. Fair play and substantial justice connote five factors: (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interests of the several states in furthering fundamental substantive social policies. Burger King, 471 U.S. at 476-77, 105 S.Ct. at 2184-85.
 
 
 42
 In the case at bar, the first and fifth factors converge and weigh heavily against the majority's holding. The majority asserts that any burden placed on the insurance guaranty associations and the social policy they serve may be alleviated by raising assessments or reducing coverage of claims. See ante at 1559.[10] The majority further claims that Olivier's interest (the third factor) and the fifth factor are intertwined such that a failure to find personal jurisdiction over LIGA and SCIGA will "frustrate the very purposes of the state insurance guaranty associations." See ante at 1559. The majority underestimates the scope and magnitude of the effect its holding will have on insurance guaranty associations. As non-profit creatures of statute designed to benefit in-state claimants and insureds, they will have to raise relatively substantial sums of money, in what may become a large number of cases, to hire attorneys in foreign jurisdictions and pay other costs of defense in foreign fora. The social goal of aiding claimants and insureds of insolvent insurers will be disserved, and perhaps even defeated, by forcing the guaranty associations to expend a large share of their resources defending in foreign fora rather than actually satisfying covered claims.
 
 
 43
 Returning to the plaintiff's interest in obtaining convenient and effective relief, the majority is unwilling to force Olivier to pursue his claims in Louisiana (his home state) and South Carolina. However, such litigation is not likely to be significantly more difficult or costly in those fora because the issues are primarily of a legal rather than a factual nature. Furthermore, unless SCIGA fails to satisfy all of Olivier's allegedly covered claim, he will have to litigate in only one forum.[11] Perhaps the majority means to adopt Olivier's argument that, unless the court below has personal jurisdiction over appellees, he could be faced with a denial of coverage by each association in its own state courts. The fatal flaw in this argument is that it assumes that the court below will decide questions of Louisiana and South Carolina law contrary to the way the Louisiana and South Carolina courts would. Surely, Olivier cannot have a legitimate interest in a forum based on the possibility that it will decide questions of foreign law erroneously.[12] Indeed, his only legitimate interest is in the efficiency of obtaining relief if it is due, not in obtaining a more favorable holding on the substantive law. Burger King, 471 U.S. at 477, 105 S.Ct. at 2184.
 
 
 44
 Harking back to the second factor, which the majority ignores, Alabama, the forum state, possesses only a relatively minor interest in supplying the forum for this case. The underlying tort occurred and was reduced to judgment in Alabama, but all the parties to the tort action and the garnishment action (with the exception of the Alabama Insurance Guaranty Association) hail from outside Alabama.
 
 
 45
 Finally, the interstate judicial system's interest in obtaining the most efficient resolution of controversies might weigh in favor of a finding of personal jurisdiction in this case because judicial resources might be saved if Olivier were not faced with the possibility of having to seek garnishment against AIGA, LIGA, and SCIGA in three different fora to obtain complete satisfaction of his covered claim. However, this judicial efficiency argument squarely depends on Olivier's being unable to satisfy in full his allegedly covered claim against SCIGA.[13] This contingent interest in judicial efficiency cannot justify an exercise of personal jurisdiction in light of Olivier's insufficient showing on the other requirements of due process in the realm of personal jurisdiction.
 
 
 46
 For the foregoing reasons, I dissent.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 Property and liability guaranty funds, such as AIGA, LIGA and SCIGA, have been established by law in each of the fifty states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. Most of these laws are based on the "Post-Assessment Property and Liability Insurance Guaranty Association Model Act" adopted by the National Association of Insurance Commissioners in December, 1969. See generally Reference Handbook on Insurance Company Insolvency 459 et seq. (Richard J. Marcus, ed., 2d ed. 1989)
 
 
 [2]
 The text of this section after amendments in 1987 does not differ materially from the text as it existed at the time of Olivier's accident and the date of insolvency of Midland Insurance. The current text reads as follows:
 "Covered claim" means an unpaid claim, including one for unearned premiums by or against the insured or agent, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Part applies issued by an insurer, if such insurer becomes an insolvent insurer after September 1, 1970, and: (i) The claimant or insured is a resident of this state at the time of the insured event; or (ii) The property from which the claim arises is permanently located in this state.
 
 
 [3]
 For the sake of brevity, where the South Carolina statutes governing SCIGA do not contain any important differences from the Louisiana statutes governing LIGA, we have omitted from this opinion the texts of the South Carolina statutes
 
 
 [4]
 The relevant portions of these sections read as follows:
 A. The association shall:
 (1)(a) Be obliged to the extent of the covered claims....
 (2) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent.
 
 
 [5]
 S.C.Code Ann. § 38-31-60(b) corresponds to La.Rev.Stat.Ann. § 22:1382 A(2). The first sentence of the paragraph in the South Carolina Code is virtually identical to its Louisiana counterpart. The South Carolina Legislature, however, added the following to paragraph (b) of § 38-31-60:
 However, the Association has the right but not the obligation to defend an insured who is not a resident of this State at the time of the insured event unless the property from which the claim arises is permanently located in this State in which instance the Association does have the obligation to defend the insured.
 
 
 [1]
 Indeed, this portion of the majority's reasoning smacks of the "stream of commerce" theory of minimum contacts that was rejected by a plurality of the Supreme Court in Asahi Metal Indus. v. Superior Court, 480 U.S. 102, 108-13, 107 S.Ct. 1026, 1030-33, 94 L.Ed.2d 92 (1987)
 
 
 [2]
 In its discussion of fair play and substantial justice, the majority evidently refers to those contacts again when it asserts that LIGA and SCIGA engaged in "economic activity" in Alabama which had "effects" in Alabama. See ante at 1559. LIGA and SCIGA engaged in no economic activity of any sort in Alabama. Further, the only effect that actions by LIGA and SCIGA may have had in Alabama is their own liability for the judgment obtained against Merritt in Alabama, and that is not an "effect" relevant to personal jurisdiction. The majority does not, and cannot, point to any sort of reliance induced or any other kind of effect in Alabama. LIGA and SCIGA simply have had no meaningful impact on Alabama
 
 
 [3]
 In the remaining case, Keelean, there was no finding regarding the defendants' collective motive behind providing the guaranty even though such a motive may legitimately be attributed to every private guarantor. Instead, the Alabama Supreme Court rested its holding, that the exercise of personal jurisdiction did not violate due process, on a flawed interpretation of Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). The Keelean court held that Calder established an " 'effects test' " under which the exercise of personal jurisdiction is proper where the defendants should have foreseen the possible effect in the forum state in the event of a default on the guaranteed note. 544 So.2d at 157. However, the so-called 'effects test' described in Calder is much narrower and is applicable to neither Keelean nor the case at bar. The Calder court held that where defendants allegedly commit the intentional tort of libel, "expressly aimed at" a plaintiff in the forum state, knowing that the libelous material will have its greatest distribution in the forum state, the exercise of personal jurisdiction is justified. 465 U.S. at 789-90, 104 S.Ct. at 1486-88. Thus, the Keelean case is inapposite
 
 
 [4]
 La.Rev.Stat.Ann. § 22:1380(A) (West Supp.1991); S.C.Code Ann. § 38-31-40 (Law.Co-op.1990)
 
 
 [5]
 La.Rev.Stat.Ann. § 22:1376 (West 1978); see S.C.Code Ann. §§ 38-31-60(b), 60(b) (Law.Co-op.1990)
 
 
 [6]
 La.Rev.Stat.Ann. § 22:1380(A) (West Supp.1991); S.C.Code Ann. § 38-31-40 (Law.Co-op.1990)
 
 
 [7]
 La.Rev.Stat.Ann. §§ 22:1379(b)(6), 1382(A)(3)(a)(i) (West Supp.1991); S.C.Code Ann. § 38-31-20(9), 38-31-60(c)(iii) (Law.Co-op.1990)
 
 
 [8]
 La.Rev.Stat.Ann. § 22:1382(A)(3)(a)(i) (West Supp.1991); S.C.Code Ann. § 38-31-60(c)(iii) (Law.Co-op.1990)
 
 
 [9]
 The Louisiana and South Carolina provisions are identical
 
 
 [10]
 Note that the majority erroneously considered this factor under the rubric of minimum contacts rather than reasonableness
 
 
 [11]
 The priority provisions dictate that Olivier should seek coverage first from SCIGA because the insured, Merritt, was a South Carolina resident. See La.Stat.Ann. § 22:1386(B) (West Supp.1991); S.C.Code Ann. § 38-31-100(2) (Law.Co-op.1990)
 
 
 [12]
 Cf. Burger King, 471 U.S. at 483 n. 26, 105 S.Ct. at 2188 n. 26 (any conflict between state social policies should be resolved by choice of law principles; such conflict will not render an exercise of personal jurisdiction unreasonable)
 
 
 [13]
 See supra note 11