896 F.Supp. 1190 (1995)
HOECHST CELANESE CORP., Plaintiff,
v.
NYLON ENGINEERING RESINS, INC., and Thomas Popoli, Defendants.
No. 94-346-CIV-FTM-24D.
United States District Court, M.D. Florida, Fort Myers Division.
August 21, 1995.
*1191 Gary T. Stiphany, Concepcion, Sexton & Stiphany, P.A., Coral Gables, FL, Daniel Ebenstein, Anthony F. LoCicero, Sheryl D. Jassen, Neil S. Goldstein, Amster, Rothstein & Ebenstein, New York City, for Hoechst Celanese Corporation.
Gregg Darrow Thomas, Holland & Knight, Tampa, FL, for Nylon Engineering Resins, Inc., Thomas E. Popoli.
Gary T. Stiphany, Concepcion, Sexton & Stiphany, P.A., Coral Gables, FL, Daniel Ebenstein, Anthony F. LoCicero, Sheryl D. Jassen, Amster, Rothstein & Ebenstein, New York City, for Carl Amond.

ORDER
BUCKLEW, District Judge.
This cause comes before the Court for consideration of the Counterdefendant Carl Amond's Motion to Dismiss Counterclaim (Doc. No. 26, filed January 23, 1995). The Counterplaintiff filed a response on February 6, 1995 (Doc. No. 31). Counterdefendant Carl Amond also filed a reply memorandum in support of his Motion to Dismiss (Doc. No. 38, filed March 13, 1995), to which Counterplaintiff filed a response on March 27, 1995 (Doc. No. 40).
The Counterdefendant, Carl Amond, is an executive of the Hoechst Celanese Corporation ("Hoechst Celanese") and a resident of Texas. Hoechst Celanese is a distributor of raw plastics materials.
The Counterplaintiff, Nylon Engineering Resins, Inc. ("Nylon Engineering"), is a Delaware corporation, headquartered in Ft. Myers, Florida, which imports and resells raw plastics materials. Thomas Popoli is the president of Nylon Engineering. Approximately 14% of Nylon Engineering's customer base also reside in the State of Florida.
On November 2, 1994, Hoechst Celanese filed a trademark infringement action against Nylon Engineering (to which Amond is not a party), alleging that the latter had counterfeited trademarks for certain of Hoechst Celanese's resins.
On November 4, 1994, Amond gave an interview in Akron, Ohio to Plastics News, a trade publication. Plastics News is published and printed by Crane Communications, Inc. in Illinois (where Crane is incorporated) and has its editorial headquarters in Ohio. Plastics News is published weekly and is circulated to approximately 60,000 subscribers. Around 1,100 (or 1.8%) of these subscribers reside in Florida. In this interview, Amond made statements to the effect that Nylon Engineering and Popoli had been selling from five to seven million pounds of counterfeit resins per year. The interview was published on November 14, 1994.
On December 5, 1994 (eight days after answering the original complaint), Nylon Engineering and Popoli (collectively, "Nylon *1192 Engineering") brought a counterclaim (pursuant to Fed.R.Civ.P. 13(b)) against Hoechst Celanese and Amond, alleging that Amond defamed Nylon Engineering in his interview with Plastics News.
On January 23, 1995, Amond moved the Court to dismiss Nylon Engineering's Counterclaim for lack of personal jurisdiction.

Personal Jurisdiction
We move to the sole issue before the Court: Amond's motion to dismiss for lack of personal jurisdiction.[1] Fed.R.Civ.P. 12(b)(2). When a district court does not conduct a discretionary evidentiary hearing on a motion to dismiss for lack of jurisdiction, the plaintiff must establish a prima facie case of personal jurisdiction over a nonresident defendant. Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir.1990) (citing Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir.1988)). The district court must accept the facts alleged in the complaint as true, to the extent that they are uncontroverted by the defendant's affidavits, and where the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable evidence in favor of the plaintiff. Id.
Whether the Court can exercise personal jurisdiction over a nonresident defendant involves a two-part analysis. Madara, 916 F.2d at 1514; Cable/Home Communication Corp. v. Network Prods. Inc., 902 F.2d 829, 855 (11th Cir.1990). First the Court considers the jurisdictional question under Florida's long-arm statute. Madara, 916 F.2d at 1514; Cable/Home, 902 F.2d at 855. If there is a basis for the assertion of personal jurisdiction under the long-arm statute, the Court next determines whether the quantity and/or quality of the contacts between the defendant and the forum state satisfy the Due Process Clause of the Fourteenth Amendment so as not to offend "traditional notions of fair play and substantial justice." Madara, 916 F.2d at 1514 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)); Cable/Home, 902 F.2d at 855.
Personal jurisdiction over a nonresident defendant must be authorized by specific legislation: the state's "long-arm" statute. Omni Capital Int'l. v. Rudolf Wolff & Co., 484 U.S. 97, 109, 108 S.Ct. 404, 412, 98 L.Ed.2d 415 (1987). Because the reach of the Florida long-arm statute is a question of Florida law, federal courts are required to construe it as would the Florida Supreme Court. Madara, 916 F.2d at 1514 (citing Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V., 701 F.2d 889, 890-91 (11th Cir.1983)); Cable/Home, 902 F.2d at 856. In this instance, the relevant portion of the long-arm is its "Tortious Act Provision."[2] FLA.STAT.ANN. § 48.193(1)(b).
The Court determines that Florida law interpreting the Tortious Act Provision of the Florida Statutes provides a sufficient basis for asserting personal jurisdiction over the nonresident Counterdefendant. Florida courts have held that the provision encompasses libelous statements made toward Florida residents by a nonresident defendant. See, e.g., Firestone v. Time, Inc. 271 So.2d 745 (Fla.1972), vacated on other grounds, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (defamation action against nonresident publisher of a nationally-distributed magazine); see also Rebozo v. Washington Post Co., 515 F.2d 1208, 1212 (5th Cir.1975)[3] (holding that where nonresident publisher prints and circulates allegedly *1193 libelous statement tortious act provision applies).
The fact that Amond is a private individual and not the publisher of Plastics News does not place him outside the scope of the Tortious Act Provision of Florida's long-arm statute. In Madara, 916 F.2d at 1515 n. 6, the court applied Florida's long-arm statute in libel action by nonresident plaintiff against non-resident defendant in connection with interview with trade magazine, which was subsequently distributed in Florida. Likewise, in Stepanian v. Addis, 782 F.2d 902 (11th Cir.1986), the court applied the long-arm statute to a defamation action against a non-resident attorney who had allegedly made defamatory statements to a foreign periodical distributed in Florida. The only relevant issue is whether the alleged defamation or libel was, in fact, circulated in Florida. Keeton v. Hustler Magazine, Inc. 465 U.S. 770, 777, 104 S.Ct. 1473, 1479-80, 79 L.Ed.2d 790 (1984) (holding that tort of libel generally held to occur wherever offending material is circulated); see Friedgood v. Peters Publishing Co., 521 So.2d 236 (Fla. 4th DCA), rev. denied, 531 So.2d 1353 (Fla.1988), cert. denied, 488 U.S. 1042, 109 S.Ct. 867, 102 L.Ed.2d 991 (1989). In this instance, Plastics News had, at the time of the material's publication, a circulation of approximately 1,100 subscribers in Florida. This circulation of Amond's allegedly defamatory statements in Florida provides a sufficient basis to extend personal jurisdiction over him under the Tortious Act Provision of Florida's long-arm statute.
Nonetheless, the effective boundary of the long-arm statute is not determined by its own logic, but by constitutional principles of due process, the consideration of which constitutes the second phase of the Court's two-part jurisdictional analysis. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). This second phase also involves a bifurcated analysis: "first, has [the defendant] established sufficient minimum contacts with the forum to allow the forum constitutionally to assert jurisdiction over him? Second, would the assertion of such jurisdiction offend `traditional notions of fair play and substantial justice?'" Sun Bank, N.A. v. E.F. Hutton & Co., 926 F.2d 1030, 1034 (11th Cir.1991) (quoting International Shoe, 326 U.S. at 316, 66 S.Ct. at 158); Madara, 916 F.2d at 1515-16.[4]
The first prong of this second, constitutional, phase of the Court's jurisdictional analysis asks the Court to consider whether the defendant has purposefully established certain "minimum contacts" with the forum state out of which the instant action arises. Asahi Metal Indus. Co. v. Superior Ct. of Cal., 480 U.S. 102, 108-09, 107 S.Ct. 1026, 1030-31, 94 L.Ed.2d 92 (1987) (quoting Burger King, 471 U.S. at 475, 105 S.Ct. at 2183-84); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); Cable/Home, 902 F.2d at 857.
The Court's minimum contacts test is not formulaic or "talismanic." Burger King, 471 U.S. at 485, 105 S.Ct. at 2189. On the contrary, at the focus of its inquiry is foreseeability. Id. at 474, 105 S.Ct. at 2183; Sun Bank, 926 F.2d at 1034. This is not, however, merely the "foreseeability of causing injury in another State." Burger King, 471 U.S. at 474, 105 S.Ct. at 2183 (citing World-Wide, 444 U.S. at 295, 100 S.Ct. at 566) ("[T]his kind of foreseeability is not a `sufficient benchmark' for exercising personal jurisdiction"). Instead, foreseeability inheres in "the defendant['s] purposefully avail[ing] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 475, 105 S.Ct. at 2183 (quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 *1194 (1958)); Sun Bank, 926 F.2d at 1034; Bangor Punta Operations, Inc. v. Universal Marine Co., 543 F.2d 1107, 1110 (5th Cir.1976). At its core, then, the minimum contacts involves some degree of reciprocity. See International Shoe, 326 U.S. at 319, 66 S.Ct. at 160 ("The exercise of [the privilege of conducting activities in a state] may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the [defendant] to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.")
In Keeton, 465 U.S. at 772, 104 S.Ct. at 1477, for example, the plaintiff, a New York resident, sued Hustler Magazine, an Ohio corporation whose principal place of business was California, for libel in New Hampshire. Noting, however, that the defendant sold between 10,000 and 15,000 copies of its publication in the forum state per month, the Court found sufficient minimum contacts to subject to jurisdiction in that state. Keeton, 465 U.S. at 781, 104 S.Ct. at 1481-82. The Court explained: "Where, as in this case, [the defendant] has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." Id. See also Rebozo, 515 F.2d at 1216 (finding sufficient minimum contacts where nonresident newspaper engaged in "substantial news gathering and news distributing activities [within Florida] ... [from which it] derived considerable pecuniary benefit.")
In Madara, 916 F.2d at 1513, on the other hand, the nonresident defendant was a noted musician and performer who had given an interview to a New York trade magazine, allegedly defaming the plaintiff. This circuit found insufficient minimum contacts between the defendant and the forum state and went on to distinguish the case from Keeton: "The act of giving the interview ... did not exhibit the `continuous[] and deliberate[] exploit[ation]' of the Florida market to the extent found important to jurisdiction in Keeton." Id. at 1519 (quoting Keeton, 465 U.S. at 781, 104 S.Ct. at 1481-82). The Madara court further emphasized that "Although this litigation arose from [the defendant's] statement, it did not arise from the activities [he] engaged in in Florida." Id. at 1518.[5]See also Green v. USF & G Corp., 772 F.Supp. 1258, 1262 (S.D.Fla.1991) (finding insufficient minimum contacts where nonresident defendant made single, unsolicited, but allegedly defamatory, phone call into Florida).
While Plastics News may have deliberately exploited the forum state, Amond has not. Like the defendant in Madara, Amond was neither the publisher of a magazine with a circulation in Florida nor a paid contributor to it. And so, it is unclear as to how his comments might be related to any attempts by him to avail himself of the privilege of conducting activities in Florida. If Amond's remarks represent an attempt (or part of an attempt) to "avail" himself of anything, it is an attempt to sway Nylon Engineering's (potential) customer base, most of whom reside out of Florida.[6]
Nylon Engineering argues that, in the absence of evidence to suggest that Amond has purposefully availed himself of opportunities in the forum state, the Court should follow a broad interpretation of Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In Calder, the plaintiff lived and worked in California as an entertainer. Id. at 785, 104 S.Ct. at 1484-85. The defendants *1195 were Florida residents. Id. Each defendant was employed by the National Enquirer, one as a reporter and the other as an executive and editor. Id. at 785-86, 104 S.Ct. at 1484-85. The Enquirer itself, while incorporated and headquartered in Florida, was circulated nationally, with approximately 12% of that circulation in California (almost twice the level of the next highest state). Id. at 785, 104 S.Ct. at 1484-85. The plaintiff sued the defendants over an article written by the one from Florida and edited by the other in Florida. Id. at 786, 104 S.Ct. at 1485. The article alleged that plaintiff had a drinking problem that was interfering with her career. Id. at 788, 104 S.Ct. at 1486. The Supreme Court found the defendants subject to the personal jurisdiction of the California courts, emphasizing that "California is the focal point both of the story and of the harm suffered." Id. at 789, 104 S.Ct. at 1486.
Nylon Engineering reads Calder as holding that where the defendant commits an intentional tort against a resident of the forum state and the "brunt of the impact" is felt there, the minimum contacts phase of the constitutional analysis is satisfied. (Doc. No. 38 at 11.) This reading of Calder has come to be known, in some other circuits, as the "effects test." See Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 148 (3rd Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992) ("Under the effects test, a court may exercise personal jurisdiction over a nonresident defendant who acts outside the forum state to cause an effect upon the plaintiff within the forum state.") To buttress this reading of Calder, Nylon Engineering cites a number of cases from outside this circuit, including Hugel v. McNell, 886 F.2d 1 (1st Cir.1989), cert. denied, 494 U.S. 1079, 110 S.Ct. 1808, 108 L.Ed.2d 939 (1990) (finding minimum contacts to New Hampshire where nonresident defendant gives defamatory interview about New Hampshire resident) and Burt v. Board of Regents, 757 F.2d 242 (10th Cir.1985), vacated, Connolly v. Burt, 475 U.S. 1063, 106 S.Ct. 1372, 89 L.Ed.2d 599 (1986) (finding minimum contacts where Nebraska defendant writes defamatory letter about Colorado and sends it to plaintiff's prospective employer in Colorado).
The "effects test" (or the broad reading of Calder) has not been unanimously adopted among the circuits, however. In Wallace v. Herron, 778 F.2d 391 (7th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986), for example, the Seventh Circuit denied that Calder created any sort of exception to the rule that the defendant must purposefully avail himself of opportunities in the forum state:
We do not believe that the Supreme Court, in Calder, was saying that any plaintiff may hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff.... [T]he so-called `effects' test is merely another way of assessing the defendant's relevant contacts with the forum State. The defendant must still `purposefully avail' [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.
Id. at 394-95 (quoting Burger King, 471 U.S. at 475, 105 S.Ct. at 2183). See also Wilson v. Belin, 20 F.3d 644, 648-49 (5th Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994) (finding that "[plaintiff] reads Calder too broadly" where plaintiff seeks personal jurisdiction over nonresident defendants who had given phone interviews critical of plaintiff).
While the Eleventh Circuit has yet to address the "effects test" fully, it has, in passing, suggested a very limited reading of Calder:
The Calder court held that where defendants allegedly commit an intentional tort of libel, `expressly aimed at' a plaintiff in the forum state, knowing that the libelous material will have its greatest distribution in the forum state, the exercise of personal jurisdiction is justified.
Olivier v. Merritt Dredging Co., 954 F.2d 1553, 1561 n. 3 (11th Cir.) (Johnson, J., dissenting) [hereinafter Olivier I], vacated, 979 F.2d 827 (11th Cir.1992) (en banc) [hereinafter *1196 Olivier II]. The U.S. District Court for the Southern District of Florida has pointed out that the "effects test" forces the due process inquiry to comply with the state's long-arm statute, in effect turning the jurisdictional analysis on its head: "it would seem to vitiate the two-part approach to jurisdiction to hold that in every case where a tort has occurred in the state, the exercise of jurisdiction comports with due process." Green, 772 F.Supp. at 1262.
After considering the general conflict over the extent of Calder's ruling and the Eleventh Circuit's wariness in this regard, this Court concludes that the Calder ruling does not extend so far as Nylon Engineering suggests. Calder's defendants were in the business of writing about celebrities and entertainers. As such, they resorted to California for much of their material, not to mention the fact that their writing and editing salaries derived from circulation in California more than from any other state. Here, Amond is not in the business of commenting upon rival plastics distributors in Florida. Nor is Plastics News 'circulation in Florida especially significant.[7] In short, this Court's reading of Calder does not alter its conclusion that the connection here is too attenuated to establish the minimum contacts necessary for a Florida court to exercise personal jurisdiction over Amond.
The second prong of the constitutional phase of the Court's personal jurisdiction analysis involves an inquiry into whether Florida's assertion of personal jurisdiction over Amond comports with "traditional notions of fair play and substantial justice." Asahi, 480 U.S. at 105, 107 S.Ct. at 1028 (quoting International Shoe, 326 U.S. at 316, 66 S.Ct. at 158). Among the factors the Court considers are: the forum state's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief (at least when that interest is not adequately protected by the plaintiff's power to choose the forum); and the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and shared interest of the several states in furthering fundamental substantive social policies. Burger King, 471 U.S. at 477, 105 S.Ct. at 2184-85; World-Wide, 444 U.S. at 292, 100 S.Ct. at 564-65; Madara, 916 F.2d at 1517. The Court may also consider the interests of interstate federalism and state sovereignty. World-Wide, 444 U.S. at 293, 100 S.Ct. at 565.
Had sufficient minimum contacts between Amond and Florida been shown, the Court clearly would not have found that "traditional motions of fair play and substantial justice" precluded jurisdiction. As Nylon Engineering points out, it has an obvious interest in avoiding litigating the main claim and this Counterclaim in different fora, and the interstate judicial system shares this interest. Also, Florida has some interest in accommodating its citizens in their suits against nonresident tortfeasors. See Burger King, 471 U.S. at 473, 105 S.Ct. at 2182-83 (quoting McGee v. International Life Ins. Co., 355 U.S. 220, 222-23, 78 S.Ct. 199, 200-01, 2 L.Ed.2d 223 (1957)) ("A State generally has a `manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."). Nonetheless, the Supreme Court cautions that:
Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.
World-Wide, 444 U.S. at 294, 100 S.Ct. at 566; Olivier II, 979 F.2d at 833. Because of the utter poverty of contacts between Amond *1197 and the State of Florida, and the concomitant threat that finding personal jurisdiction over him would represent to the interests of interstate federalism and state sovereignty, this Court cannot say that the present case is "one of those rare cases" in which notions of fair play and substantial justice may, in and of themselves, establish personal jurisdiction over a nonresident defendant. Asahi, 480 U.S. at 116, 107 S.Ct. at 1034 (quoting Burger King, 471 U.S. at 476, 105 S.Ct. at 2184) (Brennan, J., concurring).
In summation, while the Tortious Act Provision of Florida's long-arm statute does extend to embrace the nonresident Counterdefendant's allegedly defamatory comments made during an interview with a trade publication in Ohio, those comments, in spite of the injury the Counterplaintiff Nylon Engineering may trace to them, do not, without more, establish sufficient minimum contacts with this state for Florida courts to exercise personal jurisdiction over Amond. Nor do "traditional notions of fair play and substantial justice" create personal jurisdiction in the face of such an attenuated connection between the nonresident Counterdefendant and the forum state. Therefore, Counterdefendant Amond's motion to dismiss for lack of personal jurisdiction is GRANTED.
Accordingly, it is ORDERED and ADJUDGED that Counterdefendant Almond's Motion to Dismiss (Doc. No. 26) is GRANTED, and the Counterclaim asserted against Amond is DISMISSED for lack of personal jurisdiction.
DONE AND ORDERED.
NOTES
[1] Whether Counterplaintiff's claim against the Counterdefendant is compulsory, Fed.R.Civ.P. 13(a), or merely permissive, Fed.R.Civ.P. 13(b), is not strictly at issue insofar as even a compulsory counterclaim does not bring with it personal jurisdiction over the defendant. See Montgomery Ward Dev. Corp. v. Juster, 932 F.2d 1378, 1381-82 (11th Cir.1991).
[2] This portion reads:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself ... to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:....
(b) Committing a tortious act in this state. FLA.STAT.ANN. § 48.193(1)(b).
[3] The Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit decided before October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981).
[4] For the Court's purposes, the possibility that Amond's contacts with Florida might be sufficiently substantial to allow it "general" jurisdiction over him even with regards to unrelated activities, is not at play. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). Nylon Engineering has not argued such a scenario. (Doc. No. 31 at 9.) Nor is it clear that general jurisdiction can ever be held over private, non-resident defendant. See Burnham v. Super.Ct. of Cal., 495 U.S. 604, 610 n. 1, 110 S.Ct. 2105, 2110 n. 1, 109 L.Ed.2d 631 (1990) ("It may be that [general jurisdiction] ... applies only to corporations, which have never fitted comfortably in a jurisdictional regime based upon de facto power over the defendant's person.").
[5] The Counterplaintiff argues that Madara is not on point because the plaintiff in that case was a nonresident of Florida who had chosen the state as a forum solely for its longer statute of limitations. (Doc. No. 31 at 16-17.) Noting the Supreme Court's admonition in Keeton that "we have not to date required a plaintiff to have `minimum contacts' with the forum State before permitting that state to assert personal jurisdiction over a nonresident defendant," Keeton, 465 U.S. at 779, 104 S.Ct. at 1480-81, the Court does not find the site of plaintiff's residence to be dispositive of minimum contacts. The Court also notes that Keeton, too, involved a nonresident plaintiff's exploitation of another state's longer statute of limitation, but such "forum-shopping" did not preclude a finding either of minimum contacts or of personal jurisdiction. See id. at 776-77, 104 S.Ct. at 1479-80.
[6] Eighty-six percent of Nylon Engineering's customer base reside outside the State of Florida. (Sadighi Decl. ¶ 9.)
[7] Plastics News' circulation in Florida is approximately 1,100, or 1.8% of its total circulation. (Doc. No. 26 at 5.)