**Laura Ann VERMEULEN, Plaintiff–Appellant,**

**v.**

**RENAULT U.S.A., INC.; Regie Nationale Des Usines Renault; Jeep Eagle Sales Corporation; Regie Nationale Des Usines Renault and Chrysler Corporation, Defendants–Appellees.**

No. 91–8765.

United States Court of Appeals, Eleventh Circuit.

July 9, 1992.

As Amended Oct. 19, 1992.

Dennis T. Cathey, Cornelia, Ga., Benjamin S. Williams, Williams & Henry, Atlanta, Ga., for plaintiff-appellant.

M. Diane Owens, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., for defendants-appellees.

Dennis T. Cathey, Cornelia, Ga., Benjamin S. Williams, Williams & Henry, Atlanta, Ga., for plaintiff-appellant.

M. Diane Owens, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., for defendants-appellees.

Before KRAVITCH and DUBINA, Circuit Judges, and RONEY, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Plaintiff–Appellant Vermeulen appeals the district court's order dismissing Defendant–Appellee Regie Nationale Des Usines Renault ("RNUR") from plaintiff's product liability suit for lack of personal jurisdiction under the Georgia long-arm statute. Because we do not find Georgia's exercise of personal jurisdiction over RNUR to be inconsistent either with Georgia law or with the Due Process Clause of the Four-

teenth Amendment, we reverse and remand the case to the district court.

## I. BACKGROUND

In January 1988, the appellant purchased a 1982 Renault LeCar from her brother. At the time of the purchase, both seller and buyer were residents of North Carolina. Appellant subsequently moved to Georgia. On February 16, 1988, she suffered an accident on State Route 316, near Lawrenceville, Georgia, sustaining a spinal injury that has left her quadriplegic.

On April 18, 1989, contending that her injuries were the result of the negligent manufacture and design of the LeCar's passenger restraint system, appellant filed suit in the Superior Court of Fulton County, Georgia, against RNUR, the French manufacturer and designer of the subject vehicle; Renault, U.S.A., RNUR's wholly owned American subsidiary;[1] and Jeep Eagle Sales Corporation, the successor to American Motors Corporation ("AMC"). AMC's wholly-owned subsidiary, American Motors Sales Corporation ("AMSC"), was the distributor of LeCar in the United States.[2] Defendants removed the case on diversity grounds to Federal District Court (N.D.Ga.), and RNUR moved to dismiss the case against it for lack of personal jurisdiction.

In an order dated November 19, 1990, the district court granted RNUR's motion to dismiss without conducting an evidentiary hearing on the issue, *Vermeulen v. Renault U.S.A., Inc., et al.,* No. 1:89–cv–1042–HTW (N.D.Ga. November 19, 1990) (hereinafter "November 19 Order"), holding that Georgia's exercise of jurisdiction over RNUR was inconsistent both with the Georgia long-arm statute, O.C.G.A. § 9–10–91, and with the Due Process Clause of the Fourteenth Amendment. The district court denied plaintiff's motion for reconsideration on January 15, 1991, stating that its dismissal of RNUR from plaintiff's suit was based on the Supreme Court's decision in *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Plaintiff appeals the district court's order of dismissal.

## II. STANDARD OF REVIEW

We review the district court's dismissal for lack of *in personam* jurisdiction *de novo. Olivier v. Merritt Dredging Co., Inc.,* 954 F.2d 1553, 1555 (11th Cir.1992); *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990). Where, as here, the district court did not hold an evidentiary hearing on the jurisdictional issue, a plaintiff need only make out a prima facie case of jurisdiction over the non-resident defendant. *Delong Equipment Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843, 845 (11th Cir.1988); *Morris v. SSE, Inc.,* 843 F.2d 489, 492 (11th Cir.1988). A prima facie case is established if the plaintiff presents sufficient evidence to defeat a motion for directed verdict. *Morris,* 843 F.2d at 492. In the absence of an evidentiary hearing, the district court considering the motion to dismiss must take as true the allegations in the complaint, to the extent they are uncontradicted by the defendant's affidavits or deposition testimony. *Id.* Further, where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the plaintiff. *Id.*

## III. FACTS RELATING TO JURISDICTION

RNUR, the manufacturer and designer of appellant's 1982 LeCar, is a French corporation, wholly owned by the French government. It is undisputed that RNUR (1) has never been a corporation organized or existing under the laws of the State of Georgia; (2) has never been registered as a foreign corporation doing business in Georgia; (3) has never appointed any agent to act for it or to accept service of process in Georgia; (4) has never owned real estate or personal property located in Georgia; (5)

---

1. Renault U.S.A. was subsequently dismissed as a defendant pursuant to a stipulation between the parties. R3–45.

2. Plaintiff subsequently amended her complaint to reflect the purchase of Jeep Eagle Sales Corporation by Chrysler Corporation. R1–16.

has never maintained a telephone number or mailing address in Georgia; (6) has never maintained a bank account in Georgia; and (7) has never had an office or place of business in Georgia. R1–23–Ex. 1., pp. 2–3.

### A. The Agreements Between RNUR and AMC/AMSC

In 1979, RNUR entered into a series of commercial agreements with AMC and its wholly owned subsidiary, AMSC, pursuant to which AMSC agreed to act as the exclusive marketer and distributor of Renault automobiles in the United States.[3] It is undisputed that AMSC distributed the 1982 Renault LeCar at issue in this case under this distribution arrangement. The stated goals of the agreements between Renault and AMC/AMSC were, *inter alia*, "to promote the widest distribution of Renault products," and to "develop a dealer network for Renault products in the [United States]." R3–34–Ex. A, p. 1. Accordingly, AMSC agreed to purchase Renault vehicles, including LeCars, in France from RNUR, and to import them for resale in the United States.

Although the distribution agreement indicated that AMSC would take full responsibility for marketing and distributing Renault vehicles in the United States, *id.* at 4, the parties contemplated that Renault would be fully involved in decisions affecting the sales of its product. AMSC covenanted to "use its best efforts to carry out the Market Representation Plan." *Id.* at 6. This plan, not itself part of the record but referenced and defined in the Distributor's Agreement, was a "mutually agreed upon plan, initialled on behalf of the parties [to

the Distributor Agreement], for the franchising of Dealers to sell Renault products within the [United States]." *Id.* at 3.

The Distributor's Agreement also provided that "Renault may from time to time advise [AMSC] of suggested retail prices for Renault vehicles." *Id.* at 6. Further, the Built–Up Sales Agreement indicated that "[t]he estimated quantities of Renault Products to be purchased and sold hereunder during any Contract Year shall be mutually agreed." R3–34–Ex. B, p. 2.[4]

Although the Distributor Agreement provided that AMSC would take responsibility for maintaining "a sufficient number of trained and competent personnel" and for instructing such personnel concerning the preparation, servicing and repair of Renault products, it also stated that RNUR would "use its best efforts to provide [AMSC] with suitable assistance in connection with [such] training and instruction responsibilities." R3–34–Ex.A, pp. 7–8.

Article VII of the Distributor Agreement contemplated that AMSC would maintain responsibility for "determining assortments, minimum quantities, geographical distribution and other matters relating to" parts and accessories offered for sale by Renault pursuant to the Sales Agreements entered into by the parties. The Distributor's Agreement provided, however, that AMSC would "discuss such matters with Renault and give serious consideration to Renault's recommendations." *Id.* at 8.

Article IX of the Agreement stated that AMSC "shall print such business forms, bearing Renault trademarks and Renault trade names, for exclusive use in its 'Re-

---

**3.** The agreements executed between Renault and AMC/AMSC included: a "Distributor Agreement," R3–34–Ex. A; a "Built–Up Sales Agreement," R3–34–Ex. B; and a "Master Agreement," R3–34–Ex. E. These agreements contemplated several different commercial arrangements between the parties, including the manufacture of Renault cars at AMC's American plants and Renault's European distribution of AMC vehicles. Thus, the distribution arrangement between AMSC and Renault regarding the United States market was only one aspect of a wide-ranging alliance created by the parties through these agreements.

**4.** RNUR contends that AMSC had sole responsibility for determining the quantity and type of vehicles to be purchased from RNUR. Appellee's Brief at 22. As noted *supra*, however, where the district court has not conducted an evidentiary hearing, and the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the plaintiff. *Delong, supra; Morris, supra.* Therefore, we accept as true plaintiff's allegation that RNUR was fully involved in determining the quantity of cars to be purchased by AMSC from Renault.

nault' business as Renault and [AMSC] shall mutually agree", and that AMSC would "cause each Dealer ... to maintain such portions of its facilities as are dedicated to product identification and signage in conformity with Renault standards and as mutually agreed." *Id.* at 10.

Under Article X of the Agreement, Renault retained the full and exclusive right to and ownership of the "Renault" trademark. The Agreement provided that "[a]ny particular use of any [Renault] trademark which, in the sole judgment of Renault, is inconsistent with the image or goodwill of Renault or its business, advertising or public relations policies, will be discontinued immediately after the same comes to the attention of Renault if Renault so notifies [AMSC]." *Id.* at 11.

Although Article XI of the Agreement provided that AMSC would retain full and exclusive responsibility for advertising, promoting and merchandising Renault products, AMSC covenanted to "work closely with Renault in the planning and developing of themes and strategy and the related budget"; to "build upon the Renault name and image as the manufacturer and designer of outstanding small cars"; and to "verify the technical content of any representation concerning Renault Products." *Id.* at 12. Article XI continued:

> [AMSC] shall not publish or permit to be published any advertising material relating to Renault Products which is likely to mislead or deceive the public or to impair the image or good will of Renault or the reputation of Renault Products. If Renault notifies [AMSC] that any advertising is injurious to Renault's business, or is likely to mislead or deceive the public, or is at variance with the business, advertising or public relations policies of Renault, or is likely to impair the image or good will of Renault, [AMSC] agrees to discontinue immediately any such advertising.

*Id.* at 13.

In Article XII, AMSC agreed to appoint AMC/Renault dealers in accordance with the Market Representation Plan, discussed *supra* at 6, and undertook to "use its best efforts to assure that Dealers will comply with all sales and service manuals that Renault may from time to time issue relating to the sale and servicing of Renault Products and other matters covered by this Agreement or the Dealer Franchises." *Id.* at 14. Article XII also stated that "[A]ny dealership or dealerships operated by [AMSC] for the sale of Renault Products at retail shall at all times satisfy the standards for Renault dealerships prescribed by this Agreement, the Dealer Franchises and the sales and service manuals that Renault may issue from time to time relating to Dealers." *Id.* AMSC was responsible for the actual appointment, training and termination of such dealers. *Id.* at 13.[5]

Under Article XIII, Renault warranted its products to AMSC. *Id.* at 14. Although AMSC warranted the product to the ultimate consumer, Renault covenanted to reimburse AMSC "for warranty work performed by [AMSC] itself or by Dealers within [the United States] with respect to Renault vehicles sold therein." *Id.* at 15. Article XIII also provided that RNUR would hold harmless and indemnify AMSC against any judgment resulting from lawsuits commenced against AMSC seeking damages for alleged design or other defects in Renault products, and permitted Renault to take over the defense of any such lawsuit if Renault so chose. *Id.* at 17–18.

Article XV of the Agreement required AMSC to provide RNUR on a regular basis with certain reports and records pertaining to the distribution of Renault products. AMSC was required to provide Renault with (1) a monthly written analysis of its inventories of Renault products; (2) thrice-monthly reports of the then-current dealer stocks of Renault vehicles and the sales of Renault vehicles during the preceding 10–day period; (3) a quarterly report of all Dealer Franchise Agreements entered into

---

**5.** The "Dealer Franchises," as defined in the Distributor Agreement, were "Renault Dealer Franchise Agreement[s]" drafted by the parties, a sample of which was attached to the Distributor Agreement as Annex A–1.

during the preceding quarter, a list of all terminations of dealers during that quarter, and an opinion report assessing the impact of such new franchises and terminations on the Market Representation Plan. *Id.* at 28. AMSC also agreed to "furnish to Renault such written reports of compliance with the Market Representation Plan, and such marketing and customer satisfaction reports, as Renault may from time to time reasonably request." *Id.* at 29.

Finally, Article XVI of the Agreement stated explicitly that "[t]his Agreement does not constitute [AMSC] the agent or legal representative of Renault for any purpose whatsoever." *Id.* at 29.

The Master Agreement between Renault and AMC, R3–34–Ex. E, also contained certain provisions relevant to the new distribution arrangements between RNUR and AMC/AMSC. Prior to 1979, Renault U.S.A., RNUR's wholly-owned American subsidiary, had acted as RNUR's distributor in the United States. Under Section 4(c) of the Master Agreement, Renault agreed to cause Renault U.S.A. to transfer all its capital stock in several of the latter's distribution subsidiaries to AMC, and to cause Renault U.S.A. to sell to AMC certain inventories held by those subsidiaries or by Renault U.S.A. itself. R3–34–Ex. E, pp. 10–11.[6] The Master Agreement also provided that "AMC will cause [AMSC] to fulfill all the obligations and responsibilities of Renault's distribution subsidiaries as distributors under the terms of the Renault dealer franchises in effect at the respective times of the transfers.... In accordance with its franchising procedures, [AMSC] will also offer to reenfranchise ... dealers who are parties to a franchise with any such subsidiary at such times of transfer, provided such dealers are desirous of the same." *Id.* at 12–13. Finally, Section 4(c) provided that "AMC will offer employment on its customary terms to those officers and employees of Renault U.S.A. here-

tofore agreed upon by Renault U.S.A. and AMC." *Id.* at 13.

Section 4(e) of the Agreement created a "Policy Committee" consisting of equal numbers of "senior executives" from each company. This committee was charged with the responsibility "for reviewing the matters contemplated by this Agreement, and for recommending solutions to policy conflicts that may arise between them in connection therewith." *Id.* at 15. Section 4(e) also stated that "no decision shall be taken by either party with respect to the image or product positioning of the products of either party except by mutual agreement." *Id.*

## B. Implementation of The Agreements Between RNUR and AMC/AMSC

Implementation of the new alliance between RNUR and AMC/AMSC took many forms. First, through a number of financial agreements, RNUR invested significant amounts of capital into AMC. Between the years 1979 and 1984, RNUR committed $545,100,000.00 to AMC through various stock, warrant and debenture purchases. R2–27–Ex. 6, p. 28.[7] Under these agreements, Renault gained the right to "place certain limitations on the future incurrence by [AMC] of secured indebtedness for borrowed money and [limit] the use of the proceeds of the sales pursuant to the agreement." R2–27–Ex. 3, p. 29. As a result of this financial commitment, AMC was able to negotiate a new five-year bank credit agreement for an additional $250 million. R2–27–Ex. 3, p. 5. Ultimately, Renault came to own 46.4% of AMC's capital stock, and to hold options on AMC stock that could make RNUR the majority stockholder in AMC. R2–27–Ex. 2, p. 2. RNUR's investments in AMC were crucial to the latter's health and future prospects during the economically unstable early 1980's. R2–27–Ex. 2, p. 1; –Ex. 3, p. 2.

---

**6.** Renault U.S.A. continues to exist today, but does not play a role in the distribution of Renault products in the United States. Renault U.S.A. played no role in the distribution of the 1982 Renault LeCar at issue in this case.

**7.** For a complete chronology and discussion of these financial transactions, see R2–27–Ex. 2, p. 28; –Ex. 3, pp. 4–5. 29; –Ex. 4, pp. 21–22; –Ex. 5, pp. 22–23; and –Ex. 6, p. 26–27.

Second, AMC and RNUR agreed to the "expansion of domestic wholesale financing available to the Company's AMC, Jeep and Renault dealers, the financing of fleet sales and the making of capital loans to dealers to whom wholesale financing is also provided," with an eye toward "establishing a full-service financial company, to support AMC, Jeep and Renault sales in the U.S. and Canada." R2–27–Ex. 2, p. 18. This financial company, dubbed American Motors Financial Corp. ("AMFC"), was ultimately formed pursuant to a joint venture between AMC and Renault Credit Internationale S.A. ("RCI"), a wholly-owned subsidiary of RNUR. RCI held a 50% interest in AMFC, which operations were later expanded to include retail financing as well as dealership financing. R3–34–Ex. C, pp. 2–3; –Ex. D, pp. 6–7.

Third, RNUR also reimbursed AMC for launch costs, marketing and other operating programs in the amounts of more than $6 million in 1980, more than $22 million in 1981, more than $91 million in 1982, and more than $28 million in 1983. R2–27–Ex. 4, p. 21; –Ex. 5, p. 26.

Throughout this time period, RNUR maintained several seats on the AMC Board of Directors, although not on the AMSC Board. See, e.g., R2–27–Ex. 2, p. 47; –Ex. 3, p. 40; and –Ex. 4, p. 30. Further, Renault U.S.A. or RNUR would send its executives to work in key positions in AMC or AMSC. Deposition of Richard Willman, at p. 15. Renault U.S.A. leased these employees to AMC, but retained them on its own account. Id. at 18.[8]

The actual process of sale and resale of Renault vehicles in the United States took the following course: as noted supra, AMSC purchased the Renault vehicles in France and exported them to the United States; the decision as to where in the United States to send the Renault vehicles rested with AMSC. R1–23–Ex. A. Renault officials met several times yearly,

and engaged in frequent conversations by phone, with representatives from AMC/AMSC regarding the production, distribution and promotion of Renault vehicles. Deposition of Richard Everett, pp. 16, 20. During these meetings, the participants from both companies exchanged ideas regarding volume forecasts, monthly projections for orders, changes in vehicle specifications and marketing strategies. Id. at 21, 24. This exchange of ideas resulted in modifications of Renault vehicles designed to accommodate the American market. Id. at 45–47. RNUR built those vehicles bound for the United States in conformance with the federal regulations governing automobile production in this country. Id. at 17. RNUR was aware of the number of Renault dealerships in the United States; RNUR officials from time to time toured these dealerships. Id. at 35. There is no evidence as to whether or not RNUR officials visited any of the six Renault dealerships in Georgia. There is also no evidence that either RNUR or AMC directed any advertising specifically toward Georgia.

### C. Results of the Distribution Arrangement Between RNUR and AMC

As of December 1980, there were 1302 Renault franchised dealers in the United States, six of which, as mentioned supra, were located in Georgia. R2–27–Ex. 2, p. 3.[9] These six dealerships, as well as all other Renault dealerships in the world, were listed as part of the "Renault Network" in a pamphlet found in the glove compartment of plaintiff's LeCar. This pamphlet, dated March 1981 and bearing the Renault trademark, stated that Renault's "16,800 Branches, Distributors and Dealers throughout the world are just like helpful neighbors, being qualified and equipped to offer the motorist all the services he requires for driving with peace of

8. During this time, several members of AMC's management team, including Jose Dedeurwaerder, AMC's President from 1982–1984 and CEO in 1985 and 1986, were former employees

of Renault. See, e.g., R2–27–Ex. 3, p. 2; –Ex. 7, p. 3.

9. Renault dealerships existed in 49 out of 50 states. Everett Depo., Ex. 1.

mind." Everett Depo., Ex. 1.[10]

RNUR profited immensely from its alliance with AMC/AMSC. In 1980, RNUR led all auto manufacturers in import sales improvement with a 34% increase over 1979 volume. R2–27–Ex. 2, p. 3. RNUR led in the same category in 1981, increasing its import sales 22% over 1980 volume. R2–27–Ex. 3, p. 2. Renault sold more than 37,000 vehicles to AMSC in both 1980 and 1981, more than 50,000 vehicles in 1982, and more than 40,000 vehicles in 1983, earning over $1.3 billion dollars as a result of purchases of Renault cars, components and service parts during that four-year period. R2–27–Ex. 4, p. 21; –Ex. 5, p. 26. Sales of LeCars comprised a large percentage of these import sales. *See, e.g.,* R2–27–Ex. 3, p. 8. In 1984, the United States was the largest market for Renault sales outside of France. R2–27–Ex. 6, p. 14.

## IV. ANALYSIS

In a diversity action, a federal court may assert jurisdiction over a nonresident defendant only to the extent permitted by the long-arm statute of the forum State, and only if the exercise of jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth

Amendment. *Morris,* 843 F.2d at 492 n. 3; *Gold Kist, Inc. v. Baskin–Robbins Ice Cream,* 623 F.2d 375, 377 (5th Cir.1980).[11] When the courts of the forum State have interpreted the forum's long-arm statute to confer jurisdiction to the limits allowed by federal due process, state law need not be applied: we need only ask whether the exercise of jurisdiction over the nonresident defendant comports with due process. *Olivier,* 954 F.2d at 1557.[12]

### A. The Georgia Long–Arm Statute [13]

Both the Georgia courts and federal courts applying Georgia law have construed the Georgia long-arm statute, O.G.C.A. § 9–10–91, to confer jurisdiction to the maximum extent allowable under due process. *First United Bank of Mississippi v. First National Bank of Atlanta,* 255 Ga. 505, 340 S.E.2d 597, 599 (1986); *Coe & Payne Co. v. Weed–Mosaic Corp.,* 230 Ga. 58, 195 S.E.2d 399 (1973); *Complete Concepts, Ltd. v. General Handbag Corp.,* 880 F.2d 382, 388 (11th Cir.1989); *Bond v. Octagon Process, Inc.,* 745 F.Supp. 710, 712 (M.D.Ga.1990), *aff'd,* 926 F.2d 1573 (11th Cir.1991), *cert. denied,* ── U.S. ──, 111 S.Ct. 2855, 115 L.Ed.2d 1023

---

**10.** It is unclear whether AMSC, RNUR or any other entity was responsible for the creation of this pamphlet and its placement in the glove compartment of plaintiff's LeCar.

**11.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**12.** In *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–417 nn. 8 & 9, 104 S.Ct. 1868, 1872–72 nn. 8 & 9, 80 L.Ed.2d 404 (1984), the Supreme Court noted that there are two types of personal jurisdiction: general jurisdiction, which arises from a party's frequent contacts with the forum state unrelated to the litigation, and specific jurisdiction, which arises from contacts between the defendant and the forum that relate to the litigation. We interpret appellant's claim that Georgia has jurisdiction over RNUR in this case as an argument based on a specific jurisdiction theory, insofar as the contacts between Georgia and RNUR relate to this litigation. *See Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 374 (5th Cir.1987) (holding that specific jurisdiction rests on the state's "direct interest in the cause of action," which is

heightened if the harm occurs in the forum and if the plaintiff is a resident of the forum).

**13.** O.G.C.A. § 9–10–91 provides, in part:

A court of this state may exercise personal jurisdiction over any non-resident ... as to a cause of action arising from any of the acts, omissions, ownership, use or possession enumerated in this Code section, in the same manner as if he were a resident of the state, if in person or through an agent, he:
(1) Transacts any business within this state;
(2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act; [or]
(3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state....

The parties in this case agree that § 9–10–91(3) is the statutory provision relevant to the question of whether Georgia possesses jurisdiction over RNUR in this case.

(1991). The district court in this case acknowledged this construction of Georgia law. *See* November 19 Order at 6. Thus, we need only inquire as to whether Georgia's exercise of jurisdiction over RNUR in this case satisfies the due process requirements imposed by the Fourteenth Amendment.[14]

## B. Due Process

■■■ A defendant is amenable to a forum's specific jurisdiction if (1) it possesses sufficient minimum contacts with the forum State to satisfy due process requirements, and (2) the forum's exercise of jurisdiction comports with " 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)); *Morris*, 843 F.2d at 492. This two-part test embodies the controlling due process principle that a defendant must have "fair warning" that a particular activity may subject it to the jurisdiction of a foreign sovereign. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985); *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir.1990).

### i. Minimum Contacts

■■■ To trigger specific jurisdiction, the defendant's minimum contacts must satisfy three criteria. First, the contacts must be related to the plaintiff's cause of action or have given rise to it. *Burger King*, 471 U.S. at 472, 105 S.Ct. at 2182; *Madara*, 916 F.2d at 1516. Second, the contacts must involve "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). *See also Burger King*, 471 U.S. at 474–75, 105 S.Ct. at 2183–84. Third, the defendant's contacts with the forum State must be "such that [the defendant] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). A threshold issue in this case involves the standard by which "purposeful availment" and "reasonable anticipation" should be measured.

In recent years, the Supreme Court has grappled with this issue through its consideration of the so-called "stream of commerce" theory of personal jurisdiction. In

---

**14.** Appellees in this case, and courts in other cases, have maintained that the decision of the Georgia Supreme Court in *Gust v. Flint*, 257 Ga. 129, 356 S.E.2d 513 (1987), represents a retreat from the expansive construction given the Georgia long-arm statute by Georgia and federal courts. Although recognizing that the *Flint* decision has not overruled explicitly the prior line of cases reading the Georgia long-arm statute broadly, several courts have indicated that *"Flint* heralds a renewed emphasis on the literal language of the Georgia long-arm statute." *Cartwright v. Fokker Aircraft U.S.A., Inc.,* 713 F.Supp. 389, 392 (N.D.Ga.1988). *See also James Whiten Livestock, Inc. v. Western Iowa Farms,* 750 F.Supp. 529, 532–33 (N.D.Ga.1990), *aff'd without op.,* 948 F.2d 731 (11th Cir.1991). Indeed, the district court in this case, while acknowledging the expansive interpretation of the long-arm statute, proceeded to examine independently whether it could exercise jurisdiction over RNUR under (1) Georgia law and (2) the Due Process Clause of the Fourteenth Amendment.

Because the Georgia Supreme Court has not overruled its longstanding precedents regarding the broad scope of the Georgia long-arm statute, we do not believe that recourse to the literal language of that statute is necessary or appropriate in this case. As the Georgia Court of Appeals stated in *Gust* after the case had been remanded from the Georgia Supreme Court:

> In *Coe & Payne v. Weed–Mosaic Corp.,* [supra], the [Georgia] Supreme Court had expressed the view that our long-arm statute authorized the exercise of jurisdiction over nonresident defendants "to the maximum extent permitted by procedural due process." In its decision in the present case, the Supreme [C]ourt would appear to have abandoned that view and to have adopted the position that our long-arm statute is not susceptible to such an interpretation. However, since *Coe & Payne* was not overruled, clarification of the Supreme Court's position on this important issue will have to await a future litigation.

*Flint v. Gust,* 184 Ga.App. 242, 361 S.E.2d 722, 723 (1987). Until such clarification is forthcoming, we are bound to construe the Georgia long-arm statute to the limits of due process, to bypass the literal language of the state law and to proceed directly to the due process analysis.

*World–Wide Volkswagen, supra,* the Court considered the claim of two injured motorist that Oklahoma courts had jurisdiction over a New York-based wholesale distributor and its New York automobile retailer, which, plaintiffs contended, had sold them a defective automobile. Plaintiffs had purchased the car in New York and were injured in Oklahoma en route to Arizona. Neither defendant conducted any business in Oklahoma, shipped or sold any products to or in the state, or sought in any way to take advantage of the Oklahoma market.[15] Nevertheless, plaintiffs contended that the defendants could have foreseen that the plaintiffs would drive their vehicle to Oklahoma and suffer injury there, and that such foreseeability provided sufficient basis for Oklahoma's exercise of jurisdiction over the defendants.

The Court rejected this argument, emphasizing that " 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *Id.* at 295, 100 S.Ct. at 566. The Court, however, also rejected the notion that foreseeability is wholly irrelevant to the jurisdictional inquiry, noting that "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. at 567. The Court continued:

> [I]f the sale of a product or manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

*Id.* at 297–98, 100 S.Ct. at 567.

The Court concluded that the defendants in *World–Wide Volkswagen,* New York corporations without any association with the Oklahoma market, had not delivered their products into the stream of commerce with the expectation that they would be purchased in Oklahoma. Thus, the Court held that the "stream of commerce" analysis did not furnish a basis for Oklahoma's exercise of jurisdiction over the defendants.

In *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Court reassessed its "stream of commerce" analysis in the context of an indemnification action brought in California by Cheng Shin, a Taiwanese tire manufacturer, against Asahi, the Japanese tire valve manufacturer that had sold an allegedly defective component part to Cheng Shin. The record in that case revealed that Asahi was aware that its tire valves were incorporated into tires that were sold in California.

In a plurality opinion authored by Justice O'Connor, four justices concluded that Asahi did not possess sufficient minimum contacts with California to permit California's exercise of jurisdiction under the Due Process Clause. The plurality determined that minimum contacts did not exist where "the defendant acted by placing a product in the stream of commerce, and the stream eventually swept defendant's product into the forum state, but the defendant did nothing else to purposefully avail itself of the market in the forum State." *Asahi,* 480 U.S. at 110, 107 S.Ct. at 1031 (O'Connor, J.):

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indi-

**15.** Indeed, the Court noted that "there was no showing that any automobile sold by [the distributor or the retailer] has ever entered Oklahoma with the single exception of the vehicle involved in the present case." *World–Wide Volkswagen,* 444 U.S. at 289, 100 S.Ct. at 563.

cate an intent to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

*Id.* at 112, 107 S.Ct. at 1032 (O'Connor, J.). The plurality concluded that because Asahi (1) did not do business in California, (2) had no office, agents, employees or property in California, (3) did not advertise or otherwise solicit business in California, and (4) did not create, control or employ the distribution system that brought its valves to California, it did not possess minimum contacts with California. *Id.*

The plurality also concluded that California's exercise of jurisdiction over Asahi in this case did not comport with "traditional notions of fair play and substantial justice," and that therefore, regardless of whether Asahi possessed minimum contacts with California, the State's exercise of jurisdiction over Asahi violated due process. *Id.* at 113–116, 107 S.Ct. at 1033–34.

Justice Brennan, although concurring in the plurality's holding that California's exercise of jurisdiction did not comport with "traditional notions of fair play and substantial justice" and therefore violated due process, did not join the plurality's holding that Asahi did not possess minimum contacts with California.[16] Quoting liberally from *World–Wide Volkswagen*, Justice Brennan emphasized that the "additional conduct" showing required by the plurality was unnecessary, insofar as "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." *Id.* 480 U.S. at 117, 107 S.Ct. at 1034 (Brennan, J., concurring in part and concurring in the judgment). Justice Brennan maintained that:

[A]s long as a participant in [this flow of products] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State and indirectly benefits from the State's laws that regulate and facilitate commercial activity.

*Id.* at 117, 107 S.Ct. 1034–35 (Brennan, J., concurring in part and concurring in the judgment).

Finally, Justice Stevens, although concurring in the judgment, also declined to join the plurality's holding regarding minimum contacts on the grounds that that discussion was unnecessary given the plurality's decision regarding the "fair play and substantial justice" prong of the due process analysis.[17] Justice Stevens noted, however, that an analysis of purposeful availment and minimum contacts should take into account "the volume, the value, and the hazardous character of the components," *id.* at 122, 107 S.Ct. at 1037 (Stevens, J., concurring in part and concurring in the judgment), suggesting that "a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute 'purposeful availment' even though the item delivered to the forum State was a standard product marketed throughout the world." *Id.* (Stevens, J., concurring in part and concurring in the judgment).

As is evident from the foregoing discussion, the current state of the law regarding personal jurisdiction is unsettled. Because, however, Georgia's exercise of jurisdiction over RNUR in this case is consistent with due process under the more stringent "stream of commerce plus" analysis adopted by the *Asahi* plurality, we need not determine which standard actually con-

---

**16.** Justice Brennan was joined by Justices Marshall, Blackmun and White.

**17.** Justices White and Blackmun also joined Justice Stevens.

trols this case.[18]

■ Before considering the "stream of commerce plus" analysis in the context of this case, we must address certain issues raised by the appellees that, in our opinion, are irrelevant to our jurisdictional inquiry.

First, the fact that title to the Renault vehicles passed to AMSC in France rather than in the United States in no way determines the degree of contacts between Georgia and RNUR; " ' [i]f *International Shoe* stands for anything ..., it is that a truly interstate business may not shield itself from suit by a careful but formalistic structuring of its business dealings.' " *Benitez–Allende v. Alcan Alumino Do Brasil, S.A.,* 857 F.2d 26, 30 (1st Cir.), *cert. denied,* 489 U.S. 1018, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989) (quoting *Vencedor Manufacturing Co., Inc. v. Gougler Industries,* 557 F.2d 886, 891 (1st Cir.1977)). *See also Meyers v. Asics Corp.,* 711 F.Supp. 1001, 1005 n. 3 (C.D.Cal.1989) (citing *Taubler v. Giraud,* 655 F.2d 991, 995 (9th Cir.1981)); *Sound Move Autoplaza, Inc. v. Nissan Motor Co.,* 1989 WL 50797 at 10, 1989 U.S.Dist.Lexis 5077 at 6 (S.D.N.Y.1989).

Second, the fact that RNUR did not maintain a physical presence in Georgia is also irrelevant to a determination of whether minimum contacts exist between the defendant and the forum State. *Burger King v. Rudzewicz,* 471 U.S. at 476, 105 S.Ct. at 2184; *Cable/Home Communication Corp. v. Network Productions,* 902 F.2d 829, 858 (11th Cir.1990).

Third, the appellee argues, and the district court held, that no "alter ego" relationship existed between RNUR and AMSC, and that, consequently, RNUR cannot be said to have purposefully availed itself of the privilege of conducting business in Georgia as a result of the activities of AMSC there. November 19 Order at 10. Although we agree that (1) no "alter ego" relationship existed between AMSC and

RNUR, and that (2) to impute the actions of the former to the latter would therefore be improper, the fact that no alter ego relationship existed between the two entities does not mean that RNUR could not possess minimum contacts with Georgia as a result of its own *independent* role in the process that brought the appellant's 1982 Renault LeCar to the United States. The question is not whether the contacts between AMSC and Georgia establish minimum contacts between Georgia and RNUR, but rather whether RNUR, by virtue of its relationship with AMSC, purposefully availed itself of the privilege of conducting business in Georgia such that it could reasonably anticipate being haled into court there. That RNUR did not exercise sufficient control over AMSC to establish an alter ego relationship does not necessarily mean that it had insufficient contacts with Georgia as a result of its own actions and its participation in the decisions that resulted in AMSC presence and activity in Georgia. *See Warren v. Honda Motor Co., Ltd.,* 669 F.Supp. 365, 369–70 (D.Utah 1987); *Meyers v. Asics Corp.,* 711 F.Supp. at 1005 n. 4. We now proceed to an examination of RNUR's contacts with Georgia under Justice O'Connor's "stream of commerce plus" analysis in *Asahi.*

As noted *supra,* Justice O'Connor stated in *Asahi* that "the placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032 (O'Connor, J.). It is indisputable that RNUR delivered its vehicles into the "stream of commerce" with the expectation that they would be purchased by consumers in Georgia. The distribution system created by the alliance between Renault and AMC/AMSC contemplated a nationwide network of Renault dealerships; Renault was fully aware that several of those

---

**18.** We note, however, that in the absence of further guidance from the Supreme Court, several courts have declined to follow the *Asahi* plurality's analysis, and have instead continued to apply the "stream of commerce" approach adopted in *World–Wide Volkswagen. See, e.g., Irving v. Owens–Corning Fiberglas Corp.,* 864 F.2d 383, 386 (5th Cir.), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989); *DeMoss*

*v. City Market, Inc.,* 762 F.Supp. 913, 918 (D.Utah 1991); *Abuan v. General Electric Co.,* 735 F.Supp. 1479, 1483 (D.Guam 1990); *Curtis Management Group v. Academy of Motion Pictures Arts and Sciences,* 717 F.Supp. 1362, 1369 (S.D.Ind.1989); *Wessinger v. Vetter Corporation,* 685 F.Supp. 769, 776–777 (D.Kan.1987); *Hall v. Zambelli,* 669 F.Supp. 753, 756 (S.D.W.Va.1987).

dealerships were in Georgia. Everett Depo. at 35; R3–34–Ex. A, pp. 28–29.

The remaining question under the *Asahi* plurality's analysis is whether RNUR engaged in any additional conduct such that it could be said to have "purposefully availed" itself of the privilege of conducting business in Georgia. We hold that RNUR did engage in such activity under the standards announced by the *Asahi* plurality.

First, RNUR designed the Renault LeCar for the market in the forum State. *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032. The record reflects that meetings took place between RNUR and AMC/AMSC officials which resulted in RNUR's modification of its vehicles to accommodate the American market. Everett Depo. at 21, 45–47. Although, as noted by the appellees, there is no evidence in the record that RNUR designed the LeCar specifically for the Georgia market, the fact that RNUR designed its products for the United States generally as part of a nationwide marketing effort, in order to "promote the widest distribution of Renault products," is sufficient to satisfy this prong of the *Asahi* analysis. *In re Perrier Bottled Water Litigation,* 754 F.Supp. 264, 268 (D.Conn.1990) (holding that Perrier designed its product for the United States market, "which, of course, includes Connecticut and Pennsylvania," because Perrier's liquid containers bore liquid ounce markings rather than metric measure); *Hawes v. Honda Motor Co., Ltd.,* 738 F.Supp. 1247, 1251 (E.D.Ark. 1990); *In Re All Terrain Vehicles Litigation,* 1989 WL 30948, at 8, 1989 U.S.Dist.Lexis 1843, at 10 (E.D.Pa.1989); *Warren v. Honda Motor Corp.,* 669 F.Supp. at 370.

Second, RNUR advertised its product in the forum State. *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032. It is undisputed that Renault vehicles, including LeCar, were the subject of a nationwide advertising campaign, and that such advertising reached Georgia. Although, again, it is unclear from the record whether any of the advertising was specifically directed at Georgia, the fact that the LeCar was nationally ad-vertised, and that such advertising, by virtue of its national scope, reached Georgia is sufficient to establish the necessary relation between Georgia and RNUR. *Morris,* 843 F.2d at 494 (holding that defendant's advertising in national trade magazines sufficient to establish that defendant advertised in forum state); *See also Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1196 (9th Cir.1988) (nonresident defendant's advertising in, *inter alia,* Town & Country and the Wall Street Journal constituted advertising in California); *Fogle v. Ramsey Winch Co., Inc.,* 774 F.Supp. 19, 22 (D.D.C.1991); *Cartwright v. Fokker Aircraft,* 713 F.Supp. at 394.

RNUR contends that, to the extent its vehicles were advertised in the United States, AMSC, not RNUR, was exclusively responsible for such advertising. The record does not support this contention. Article XI of the Distributor's Agreement does state that AMSC would have full and exclusive responsibility for advertising Renault products; however, AMSC covenanted to "work closely with Renault in the planning and developing of themes and strategy and the related budget." R3–34–Ex. A, p. 12. The record also reflects that such coordination did in fact occur. Everett Depo. at 16, 20, 21, 24. Further, Renault reserved the right to veto any advertising that it deemed "injurious to Renault's business, ... likely to mislead or deceive the public, ... at variance with the business, advertising or public relations policies of Renault, or ... likely to impair the image or goodwill of Renault." R3–34–Ex. A, p. 13. *See also Id.* at 29; R3–34–Ex. E, p. 15. This reservation indicates that Renault reviewed all advertising before AMSC used it. RNUR placed great emphasis on the nature and quality of the marketing strategies used to market its products, and retained for itself a great deal of ultimate, if not daily, control over such marketing. Under these circumstances, RNUR, as well as AMSC, was responsible for the marketing and advertising of the LeCar in the United States. *See Sinatra v. National Enquirer,* 854 F.2d at 1197 (nonresident defendant's instructions to American representative to advertise, and defendant's approval of such advertis-

ing, established "advertising" contact under *Asahi*).

Third, RNUR, in conjunction with AMSC, established channels for providing regular advice to customers in Georgia. *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032. By virtue of the frequent reports provided Renault by AMSC, Renault was fully aware that 6 Renault dealerships existed in Georgia. These franchises were established pursuant to the Market Representation Plan, R3–34–Ex. A, p. 4, which incorporated Renault's strategies and vision regarding the distribution of its products.

Although AMSC exercised day-to-day control over the establishment and termination of Renault dealerships in the United States, Renault itself set the terms according to which all these dealerships conducted business: AMSC covenanted to "use its best efforts to assure that Dealers will comply with all sales and service manuals that Renault may from time to time issue relating to the sale and servicing of Renault products and other matters covered by [the Distributor's Agreement] or the Dealer franchises." *Id.* at 14. The Distributor's Agreement also stated that "[A]ny dealership or dealerships operated by [AMSC] for the sale of Renault Products at retail shall at all times satisfy the standards for Renault dealerships prescribed by this Agreement, the Dealer Franchises and the sales and service manuals that Renault may issue from time to time relating to Dealers." *Id.*

Further, RNUR took an active role in training AMSC personnel in the repair, servicing and preparation of Renault products. R3–34–Ex. A, pp. 7–8. Finally, the record reflects that RNUR and AMSC jointly engaged in the financing of retail dealerships throughout the United States. R3–34–Ex. C, pp. 2–3; –Ex. D, pp. 6–7. There is no evidence that the aforementioned six Georgia dealerships were not among those dealerships financed by Renault. *See Morris*, 843 F.2d at 494. Under these circumstances, there is no question but that Renault, as well as AMSC, established channels for providing regular advice to customers in Georgia.

Fourth, RNUR created and controlled the distribution network that brought its products into the United States and Georgia. *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1032. As discussed in detail in Part III.A *supra*, the Distributor's Agreement between RNUR and AMSC created a nationwide network for Renault products, over which Renault retained *ultimate* control through various provisions in the Agreements executed by RNUR and AMC/AMSC, and pursuant to which AMSC's decisions were subject to the review or acquiescence of RNUR. *See generally* R3–34–Ex. A. *See also* R3–34–Ex. B, p. 3, R3–34–Ex. E, pp. 10–13, 15. Further, RNUR was fully involved in the implementation of the Agreements between itself and AMSC/AMC, even though AMSC retained day-to-day control over the nationwide Renault distribution network. *See* pp. 752–53, *supra*. Finally, RNUR's involvement in the Renault distribution network is evidenced by the extensive financial support rendered AMC by RNUR. Such support, described in detail in Section III.B, *supra*, manifested itself in capital investments, reimbursements for marketing and launch costs and infusions of Renault personnel and resources into AMC/AMSC. RNUR not only enabled AMSC to fulfill its role as Renault's exclusive American distributor, and to operate to RNUR's major financial benefit the very network that RNUR disclaims as the sole responsibility of AMSC; RNUR's support also made AMC/AMSC dependent on RNUR so as to allow the latter significant control over the operations of the former. *See* Section III.C, *supra*.[19]

In sum, RNUR designed the Renault LeCar for the Georgia market, advertised the LeCar in Georgia, established

---

**19.** We also note that the additional circumstances suggested by Justice Stevens to establish minimum contacts are present in this case. *Asahi*, 480 U.S. at 122, 107 S.Ct. at 1037 (Stevens, J., concurring in part and concurring in the judgment) (analysis of purposeful availment and minimum contacts should take into account "the volume, the value, and the hazardous character of the components").

channels for customers in Georgia to seek advice about the LeCar, and maintained a distribution network by which LeCars were brought to Georgia. These contacts are sufficiently related to appellant's cause of action to confer specific jurisdiction upon Georgia. RNUR's activities in Georgia were inextricable links in the advertising and distribution network by which the appellant obtained her vehicle, the subject of this product liability suit. More importantly, RNUR directly targeted its LeCars toward Georgia, and thus fairly could expect to defend in Georgia the very type of action this case presents: a personal injury action challenging the car's design and safety. RNUR *intended* its LeCars to be brought to Georgia and took numerous *affirmative* steps to bring that result about, and jurisdiction in Georgia would not violate RNUR's due process rights.[20]

Because RNUR satisfied all the criteria identified by the *Asahi* plurality as indicative of purposeful availment, we hold that RNUR possessed minimum contacts with Georgia sufficient to satisfy the first prong of the due process inquiry into personal jurisdiction. Through its association with and involvement in the distribution network for Renault products, RNUR benefitted from the protections provided by Georgia law, and was placed on notice that it was subject to suit in Georgia. *World–Wide Volkswagen*, 444 U.S. at 297, 100

S.Ct. at 567. The fact that RNUR's contacts with Georgia were no greater than its contacts with any other state in which Renault products were sold is of no consequence; RNUR's availment of a national market through its active and profitable association with a national distributor constituted purposeful activity directed at Georgia. *Tomashevsky v. Komori Printing Machinery Co., Ltd.*, 715 F.Supp. 1562, 1565 (S.D.Fla.1989); *Fogle v. Ramsey Winch Co.*, 774 F.Supp. at 22; *In Re Perrier*, 754 F.Supp. at 268.[21]

### ii. Fair Play and Substantial Justice

Even if a non-resident defendant possesses minimum contacts with the forum State, the State's exercise of jurisdiction nevertheless violates due process unless it comports with traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. at 316, 66 S.Ct. at 158. In determining the fairness and reasonableness of a State's exercise of jurisdiction, a court must consider:

the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of

---

**20.** Although it would strengthen the case for specific jurisdiction further if appellant had obtained her car in Georgia, purchasing the vehicle in the forum state is not necessary to invoke that jurisdiction. Minimum contacts analysis, with its roots in the Due Process Clause, is a totality of the circumstances inquiry. The Due Process Clause is satisfied when, as here, the litigation is related to the defendant's in-forum activities in such a way that the defendant's due process right to "fair warning" that its activities may subject it to the forum's jurisdiction is protected. *See Burger King*, 471 U.S. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d 528.

**21.** *Bond v. Octagon Process, Inc.*, 745 F.Supp. 710 (M.D.Ga.1990), *aff'd*, 926 F.2d 1573 (11th Cir.1991), does not compel a different result. In that case, which is more analogous to *World–Wide Volkswagen* than to the instant case, the defendant, a New Jersey manufacturer of a cleaning solvent under contract to the Department of Defense ("DOD"), had no contacts with

Georgia other than those created by the product's ultimate consumer, which itself transported the product to Georgia. Although the defendant may have known that its product would find its way to Georgia, it did not purposefully avail itself of the Georgia market when it sold its product to a national buyer. Whether DOD sent the product to Georgia or elsewhere was of no consequence to the defendant. RNUR, conversely, availed itself of the Georgia market when it created, funded and directed a distribution network that explicitly envisioned commercial activity in Georgia. Even though the plaintiff in this case actually transported the particular LeCar in question into Georgia, RNUR's activity in Georgia, unlike the activity of the defendants in *Bond* and *World–Wide Volkswagen* in the respective forum States, resulted in significant, if indirect, financial benefits for RNUR, putting it on notice that it could reasonably anticipate being haled into court in Georgia. *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567.

the several States in furthering fundamental substantive social policies." *Asahi*, 480 U.S. at 113, 107 S.Ct. at 1033 (quoting *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564 (citations omitted)). The *Asahi* Court cautioned that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id.* at 114, 107 S.Ct. at 1033. The Court also noted, however, that "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the alien defendant." *Id.* Such is the case here.

As noted *supra*, *Asahi* was an indemnification action brought by Cheng Shin, the Taiwanese manufacturer of an allegedly defective tire, against Asahi, the Japanese manufacturer of the component tire valve that Cheng Shin integrated into its final product. The individual injured as a result of the alleged defect in the tire had already obtained relief in the California courts from Cheng Shin, which sought indemnification by Asahi.

The *Asahi* Court, upon consideration of the factors outlined above, determined that California's exercise of jurisdiction over Asahi did not comport with traditional notions of fair play and substantial justice. The Court noted that the burden on Asahi was severe, in that it had to (1) "traverse the distance between [its] headquarters in Japan and the Superior Court of California," and (2) "submit its dispute with Cheng Shin to a foreign nation's judicial system." *Id.* at 114, 107 S.Ct. at 1033. The Court also noted that because the plaintiff, Cheng Shin, was not a California resident, and because the action was "primarily about indemnification rather than safety standards," the interest of the forum State in having the dispute adjudicated there was diminished considerably. Similarly, the defendant's lack of contacts with California lessened the plaintiff's interest in having the dispute adjudicated in California. *Id.* Finally, the Court noted that in an international context, the interests of foreign na-

tions in a State's assertion of jurisdiction over their citizens, as well as the "Federal interest in Government's foreign relations policies," counseled "an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State." *Id.* at 115, 107 S.Ct. at 1034. Thus, on the basis of these factors, the Court held that California's exercise of jurisdiction over the plaintiff did not comport with traditional notions of fair play and substantial justice.

This case is different in kind from *Asahi*. First, the plaintiff in this case is not a foreign corporation seeking indemnification from another foreign corporation, as in *Asahi*, but rather a Georgia resident, who seeks relief for the crippling injuries she suffered as a result of an alleged defect in her Renault LeCar. Her interest in having her case adjudicated in Georgia is manifest.

Second, this case, unlike *Asahi*, is not about indemnification but rather about product safety. Georgia's interest in adjudicating this dispute is also manifest, given that it has a compelling interest in protecting its residents from unsafe products that find their way into the state. *Morris*, 843 F.2d at 495.

Third, RNUR's interest in having this dispute adjudicated abroad is minimal; whereas Asahi was burdened because it was forced to submit its dispute with Cheng Shin to a foreign nation's judicial system, RNUR stands ready to undertake the defense of any lawsuit against AMSC that arises from injuries alleged to have been caused by defects in Renault vehicles, having expressly reserved the right to take over the defense of any lawsuit in the United States involving allegedly defective Renault products. R3–34–Ex. A, pp. 17–18. Thus, subjecting RNUR to Georgia's adjudicatory system works no unfair surprise against it. Moreover, in light of the relative burden that would be caused plaintiff if this case were adjudicated in France, the burdens on RNUR caused by adjudication in Georgia are by no means unfair. *Delong Equipment Co.*, 840 F.2d at 850, 854

("[A]ny inconvenience caused to [defendants] by subjecting them to the jurisdiction of the Northern District of Georgia is overridden by the greater inconvenience of requiring a Georgia plaintiff, injured in Georgia by the defendants' purposeful activity in and directed at Georgia, to pursue its cause of action in a foreign forum.").

Fourth, although witnesses and evidence concerning the LeCar's manufacture and design are located in France, evidence and witnesses concerning the accident itself are located primarily in Georgia; furthermore, dismissal of RNUR from the plaintiff's suit would not end the litigation, but would merely splinter it, leaving plaintiff and the other defendants in Georgia, while allowing plaintiff to proceed against RNUR in France. Thus, efficient resolution of this case suggests that jurisdiction be asserted over RNUR in Georgia. *Morris*, 843 F.2d at 495.

In short, this is not "one of those rare cases in which 'minimum requirements inherent in the concept of "fair play and substantial justice" ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.'" *Asahi*, 480 U.S. at 116, 107 S.Ct. at 1034 (Brennan, J., concurring in part and concurring in the judgment) (quoting *Burger King v. Rudzewicz*, 471 U.S. at 477–78, 105 S.Ct. at 2184–85).

Thus, we hold that RNUR possesses sufficient contacts with Georgia to satisfy due process requirements, and that Georgia's exercise of jurisdiction over RNUR comports with traditional notions of fair play and substantial justice.

## V. CONCLUSION

For the foregoing reasons, we conclude that the plaintiff has made out a prima facie case of personal jurisdiction over RNUR. We therefore REVERSE the dismissal of RNUR from the plaintiff's lawsuit, and REMAND this case to the district court for further proceedings consistent with this opinion.